UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| T. ROWE PRICE GROUP, INC., T. ROWE PRICE ASSOCIATES, INC., and T. ROWE PRICE INVESTMENT SERVICES, INC., | : : : : |
| Plaintiffs, | : |
| v. | : : |
| MICHAEL R. NEEDLE and WILLIAM A. NEEDLE, | : : : |
| Defendants | |

## COMPLAINT

Plaintiffs T. Rowe Price Group, Inc., T. Rowe Price Associates, Inc., and T. Rowe Price Investment Services, Inc. (collectively "T. Rowe Price") allege as follows:

## INTRODUCTION

1.     T. Rowe Price files this complaint for declaratory and injunctive relief because the defendants, Michael R. Needle and William A. Needle (collectively, the "Needles") have—for the second time—initiated an arbitration against T. Rowe Price that this Court already prohibited the Needles from bringing or maintaining, and because in that improper arbitration the Needles attempt to assert substantive claims that are barred by res judicata based on a final judgment of this Court. T. Rowe Price therefore seeks a declaration that the Needles (a) are precluded from pursuing arbitration against T. Rowe Price based on any theory of standing to invoke such arbitration and (b) are precluded from bringing or maintaining, in any forum, any cause of action based on the same factual allegations that were already litigated between the same parties in this Court and resolved on the merits in T. Rowe Price's favor. T. Rowe Price also seeks injunctive relief to effectuate both this Court's prior judgment and the requested declarations, so that the

1

Needles will be subject to contempt sanctions if they continue to bring abusive and repetitive claims against T. Rowe Price in the future.

## JURISDICTION AND VENUE

2.      The Court has jurisdiction over this matter under 28 U.S.C. § 1332 because the plaintiffs are citizens of Maryland, the defendants are citizens of Pennsylvania, and the amount in controversy exceeds the sum or value of $75,000.

3.      The Court also has jurisdiction over this matter under 28 U.S.C. § 1331 because the plaintiffs seek declaratory and injunctive relief relating to the arbitrability of, among other claims, a cause of action arising under the Securities Exchange Act of 1934, 15 U.S.C. § 78j and United States Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5.

4.      The Court has jurisdiction to grant declaratory relief in this matter under 28 U.S.C. § 2201.

5.      The Court has jurisdiction to grant injunctive relief in this matter under, among other sources of authority, 28 U.S.C. § 1651.

6.      Venue is proper in this district under 28 U.S.C. § 1391 because both defendants reside in Pennsylvania and in this district.

## PARTIES

7.      Plaintiff T. Rowe Price Group, Inc. is a publicly held corporation incorporated in Maryland with its principal place of business in Baltimore, Maryland.

8.      Plaintiff T. Rowe Price Associates, Inc. is a wholly owned subsidiary of T. Rowe Price Group, Inc. and is incorporated in Maryland with its principal place of business in Baltimore, Maryland.

9.      Plaintiff T. Rowe Price Investment Services, Inc. is a wholly owned subsidiary of T. Rowe Price Associates, Inc. and is incorporated in Maryland with its principal place of business in Maryland.

10.     Defendant Michael R. Needle is a resident of Pennsylvania with an address of 1904 Wallace Street, Philadelphia, Pennsylvania 19130.

11.     Defendant William A. Needle is a resident of Pennsylvania with an address (according to his submission to the Financial Industry Regulatory Authority described below at paragraph 24) of 1904 Wallace Street, Philadelphia, Pennsylvania 19130.

## THE PRIOR FEDERAL LITIGATION AND ENJOINED FINRA ARBITRATION

12.     On October 30, 2021, the Needles filed a civil action against T. Rowe Price in this Court at docket number 2:21-cv-04786-NIQA (the "First Litigation"). The case was assigned to the Honorable Nitza I. Quiñones Alejandro.

13.     On January 28, 2022, the Needles filed an Amended Complaint in the First Litigation. A true and correct copy of the Needles' Amended Complaint, without its original exhibits, is attached hereto as **Exhibit A**.

14.     All of the Needles' claims in the First Litigation were based on allegations about T. Rowe Price's and other defendants' conduct in relation to accounts belonging to Rhea S. Needle, the Needles' deceased mother. The other defendants in the First Litigation were Edward Dosik (the Needles' brother-in-law), who was the executor of Rhea Needle's estate, and the Estate of Susan Dosik (the Needles' sister and Edward Dosik's spouse).

15.     In their Amended Complaint, the Needles asserted three claims against T. Rowe Price: Count I under the Federal Arbitration Act, 9 U.S.C. §§ 3 and 4, seeking to require T. Rowe Price to arbitrate the Needles' substantive claims before the Financial Industry Regulatory

Authority ("FINRA"); Count III, alleging violations of the Securities Exchange Act of 1934 and Rule 10b-5; and Count V, alleging violations of the Pennsylvania Unfair Trade Practices and Consumer Protection Law.

16.     Despite having filed an Amended Complaint seeking to compel arbitration before FINRA, the Needles informed T. Rowe Price that they intended to commence a FINRA arbitration without waiting for this Court to adjudicate the issue of arbitrability. Therefore, on February 10, 2022, T. Rowe Price moved for a preliminary injunction to prevent the Needles from commencing or maintaining a FINRA arbitration before the Court adjudicated the threshold issue of the arbitrability of the Needles' substantive claims.

17.     Without waiting for the Court to address the preliminary injunction motion, the Needles then commenced a FINRA arbitration against T. Rowe Price on February 17, 2022.

18.     On March 28, 2022, the Court granted T. Rowe Price's motion and issued a preliminary injunction forbidding the Needles from pursuing their FINRA arbitration until the Court adjudicated Count I of their Amended Complaint. A true and correct copy of the Court's Order and Opinion on the preliminary injunction is attached hereto as **Exhibit B**.

19.     In light of the preliminary injunction, FINRA declined to proceed with arbitration.

20.     Meanwhile, T. Rowe Price and the Needles briefed the merits of the Needles' claims, including their claim under the Federal Arbitration Act, in the context of a motion to dismiss filed by T. Rowe Price on February 11, 2022.

21.     On August 19, 2022, the Court granted T. Rowe Price's motion and dismissed all of the Needles' claims against T. Rowe Price with prejudice for failure to state a claim on which relief could be granted.

22.    In its decision, the Court held that the Needles lacked standing to invoke FINRA arbitration against T. Rowe Price and that their substantive claims were, therefore, not arbitrable. As to the substantive claims, the Court held that the Needles lacked statutory standing—as opposed to Article III standing—to bring claims against T. Rowe Price under the Securities Exchange Act of 1934, Rule 10b-5, or the Pennsylvania Unfair Trade Practices and Consumer Protection Law. A true and correct copy of the Court's Order and Opinion on T. Rowe Price's motion to dismiss is attached hereto as **Exhibit C**.

23.    The Needles appealed this Court's decision to the Third Circuit, which dismissed the appeal by order dated May 26, 2023. This Court's order of August 19, 2022 in the First Litigation is therefore final, unappealable, and res judicata as between the Needles and T. Rowe Price.

## DEFENDANTS' EFFORTS TO REVIVE THEIR FINRA ARBITRATION IN DEFIANCE OF THIS COURT'S FINAL ORDER IN THE FIRST LITIGATION

24.    On October 30, 2025, the Needles filed a "Fourth Revised Statement of Claim" with FINRA (the "New FINRA Claim"). A true and correct copy of the New FINRA Claim, without its voluminous exhibits, is attached hereto as **Exhibit D**.

25.    The factual allegations the Needles make in the New FINRA Claim are substantially the same as the factual allegations they made in the First Litigation. The New FINRA Claim, like the Amended Complaint in the First Litigation, is based entirely on alleged conduct in connection with Rhea Needle's T. Rowe Price accounts, not on any conduct in connection with any T. Rowe Price account belonging to Michael Needle or William Needle.

26.    The New FINRA Claim seeks damages from T. Rowe Price in the amount of $331,726.38, which the Needles aver should be tripled under the Pennsylvania Unfair Trade Practices and Consumer Protection Law.

5

27.    The New FINRA Claim is in direct violation of this Court's August 19, 2022 decision (a) dismissing the Needles' substantive claims against T. Rowe Price for failure to state a claim upon which relief could be granted and (b) holding the Needles lack standing to invoke FINRA arbitration against T. Rowe Price based on alleged conduct relating to Rhea Needle's T. Rowe Price accounts.

28.    The New FINRA Claim purports to assert the same substantive claims against T. Rowe Price under the Securities Exchange Act of 1934, Rule 10b-5, and the Pennsylvania Unfair Trade Practices and Consumer Protection Law that this Court previously dismissed for failure to state a claim based on lack of statutory standing. Ex. D, pp.19-20, First and Second Claims. These claims are barred by res judicata arising from this Court's August 19, 2022 decision.

29.    A dismissal for lack of statutory standing is a judgment on the merits and gives rise to res judicata. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014); *Leyse v. Bank of Am. Nat'l Ass'n*, 804 F.3d 316, 320 (3d Cir. 2015); *Baldwin v. Univ. of Pittsburgh Med. Ctr.*, 636 F.3d 69, 73 (3d Cir. 2011); *Hassanati v. Int'l Lease Fin. Corp.*, 738 F. App'x 443, 444 (9th Cir. 2018); *Roberts v. Hamer*, 655 F.3d 578, 580-81 (6th Cir. 2011); *Car Carriers, Inc. v. Ford Motor Co.*, 583 F. Supp. 221, 222-24 (N.D. Ill. 1984).

30.    To the extent the New FINRA Claim purports to assert additional causes of action against T. Rowe Price for "fraud and deceit," "negligence," and "breach of contract," those additional claims are based on exactly the same factual allegations as their previously dismissed claims, the Needles could have brought those claims in the First Litigation, and all three additional claims are therefore barred by res judicata arising from this Court's August 19, 2022 decision. *See Duhaney v. Attorney General of the U.S.*, 621 F.3d 340, 347 (3d Cir. 2010).

31.    In the New FINRA Claim, the Needles present exactly the same three theories of standing to invoke FINRA arbitration that this Court expressly rejected in the First Litigation:

    a.    *compare* Ex. D, ¶¶ 1-2, 69-70 (alleging factual basis for standing as "customers" of T. Rowe Price within the meaning of FINRA Rule 12200) *with* Ex. C, Opinion at 6-7 (rejecting this argument);

    b.    *compare* Ex. D, ¶ 17 (alleging factual basis for standing based on written arbitration agreement between Rhea Needle and T. Rowe Price) *with* Ex. C, Opinion at 7-9 (rejecting this argument);

    c.    *compare* Ex. D, ¶ 62 (alleging factual basis for standing under Uniform Transfer on Death Security Registration Act) *with* Ex. C, Opinion at 9 (rejecting this argument).

32.    In an attempt to evade this Court's 2022 ruling on their lack of standing to invoke FINRA arbitration and their lack of statutory standing to assert their substantive causes of action, the Needles also appear to assert in the New FINRA Claim that, at some time in 2023 or 2024, they became "co-administrators" of Rhea Needle's estate in place of the former executor, Edward Dosik, by virtue of an alleged agreement to settle related state-court litigation between the Needles and Dosik to which T. Rowe Price was not a party. Ex. D, ¶¶ 96, 103.

33.    Upon information and belief, neither Michael Needle nor William Needle is an administrator or personal representative of the estate of Rhea Needle.

34.    In support of their contention that they are administrators of the estate of Rhea Needle, the Needles submitted with their New FINRA Claim only two pieces of evidence, neither of which shows that they are administrators of the estate.

35.     First, the Needles submitted—as Exhibit 30 to the New FINRA Claim—four pages excerpted from a December 13, 2023 "Settlement on the Record" before the Honorable Glynnis Hill of the Philadelphia Court of Common Pleas, Civil Trial Division, in a matter to which T. Rowe Price was not a party. This transcript includes a statement by Courtney Schultz, Esq., counsel for Edward Dosik, that the Needles and Dosik had agreed to a settlement under which the Needles "could be appointed then as administrators DBNCTA [*i.e.*, *de bonis non cum testamento annexo*] of Rhea's estate because they wish to pursue the FINRA matters against T. Rowe Price. And they require the ability to stand in her shoes to do that." This is at best a statement by counsel concerning what three private parties agreed among themselves to do in the future. Counsel's statement could not in itself confer administrator status on the Needles under Pennsylvania law, and it is not evidence that they presently have such status. A true and correct copy of Exhibit 30 to the New FINRA Claim, as highlighted by the Needles, is attached hereto as **Exhibit E**.

36.     Second, the Needles submitted—as Exhibit 32 to the New FINRA Claim—a September 12, 2024 adjudicatory decree issued by the Honorable Ramy Djerassi of the Philadelphia Court of Common Pleas, Orphans' Court Division. In this decree, Judge Djerassi observed that the court had "carved out authority for the Needle brothers right to proceed with litigation against T. Rowe with the Estate of Rhea S. Needle as plaintiff." Despite the Orphans' Court's statement that it had "carved out authority" of this nature, the Needles have not presented any evidence that they took the necessary steps to avail themselves of that authority—nor does the adjudicatory decree make any reference to the Needles being appointed as administrators of Rhea Needle's estate, as they allege in the New FINRA Claim. Under Pennsylvania law, only the Register of Wills has the authority to issue letters of administration to

personal representatives of a decedent's estate. *See* 20 Pa. C.S. § 901; 20 Pa. C.S. § 711(12). A true and correct copy of Exhibit 32 to the New FINRA Claim, as highlighted by the Needles, is attached hereto as **Exhibit F**.

37.     Because the Needles lack standing to invoke FINRA arbitration against T. Rowe Price on any of the theories already rejected by this Court in the First Litigation, and because the Needles also cannot show that they have standing to invoke FINRA arbitration as personal representatives of Rhea Needle's estate, there is no factual basis to require T. Rowe Price to submit to the Needles' latest abusive attempt to force T. Rowe Price into an arbitration that T. Rowe Price never agreed to.

38.     Under Pennsylvania law, only personal representatives of an estate can sue on behalf of the estate. *Marzella v. King*, 389 A.2d 659, 660 (Pa. Super. 1978). Because the Needles cannot show they are personal representatives of Rhea Needle's estate, it follows that they cannot bring any claims on behalf of the estate—in any forum.

## DEFENDANTS' EFFORTS TO FORCE T. ROWE PRICE TO ARBITRATE CLEARLY TIME-BARRED CLAIMS

39.     Even if the Needles could show that they are personal representatives of the estate of Rhea Needle, it would be futile for them to do so, because they still would not be able to point to any existing arbitrable claims of the estate against T. Rowe Price. On the contrary, it is clear on the face of the Needles' New FINRA Claim that all their asserted causes of action are time-barred.

40.     In the New FINRA Claim, the Needles repeatedly allege that the date when they themselves became aware of T. Rowe Price's alleged conduct with respect to Rhea Needle's accounts was October 30, 2019. Ex. D, ¶¶ 23, 26, 29, 32, 41, 44, 46, 51, 59, 60, 75, 82, 85. They made the same allegation in the First Litigation. Ex. A, ¶¶ 24, 25, 28, 33, 40, 43, 44, 45, 60.

41.     Thus, to the extent the Needles purport to state claims on their own behalf, they have admitted those claims accrued, at the latest, by October 30, 2019—even assuming in their favor that the discovery rule applied to toll the statute of limitations on each claim until the Needles actually discovered the relevant facts.

42.     The alleged conduct and the alleged harms to Rhea Needle underlying the First FINRA Claim all necessarily took place before Rhea Needle's death. The Needles allege that Rhea Needle died on September 18, 2018. Ex. D, ¶ 62. Therefore, on the face of the First FINRA Claim, any causes of action personal to Rhea Needle—that is, any causes of action that could be brought after her death by a personal representative of her estate—must have accrued by September 18, 2018, at the latest.

43.     The statute of limitations for a claim under the Securities Exchange Act of 1934 and/or Rule 10b-5 is the earlier of (a) two years after discovery of the facts constituting the violation or (b) five years after the violation. 28 U.S.C. § 1658(b).

44.     The statute of limitations for a claim under the Pennsylvania Unfair Trade Practices and Consumer Protection Law is six years. *Gabriel v. O'Hara*, 534 A.2d 488, 495-96 (Pa. Super. 1987).

45.     The statute of limitations for a fraud claim under Pennsylvania law is two years. 42 Pa. C.S. § 5524(7).

46.     The statute of limitations for a negligence claim under Pennsylvania law is two years. 42 Pa. C.S. § 5524(7).

47.     The statute of limitations for a breach of contract claim under Pennsylvania law is four years. 42 Pa. C.S. § 5525(a)(8).

48.     By the time the Needles filed the New FINRA Claim on October 30, 2025—more than six years after the Needles admit they themselves were in possession of all relevant alleged facts, and more than seven years after Rhea Needle died—the statute of limitations for each and every cause of action in the New FINRA Claim had already expired. And this is true regardless of whether any particular cause of action is construed as brought by the Needles in their own right or brought in their capacity as the purported administrators of Rhea Needle's estate.

## COUNT I

### DECLARATORY JUDGMENT THAT DEFENDANTS LACK STANDING TO INVOKE FINRA ARBITRATION AGAINST T. ROWE PRICE

49.     T. Rowe Price incorporates by reference the allegations in the preceding paragraphs as if the same were set forth fully herein.

50.     The Needles lack standing to invoke FINRA arbitration in their own right because this Court so held in its August 19, 2022 decision in the First Litigation, which is final and unappealable and has res judicata effect.

51.     The Needles lack standing to invoke FINRA arbitration as the administrators or personal representatives of Rhea Needle's estate because they are not, in fact, the administrators or personal representatives of Rhea Needle's estate.

WHEREFORE, pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57, the plaintiffs respectfully request that the Court enter judgment declaring that Michael R. Needle and William A. Needle lack standing to invoke FINRA arbitration, whether in their individual capacities or as administrators or personal representatives of the estate of Rhea S. Needle, against the plaintiffs, or any of them, with respect to any cause of action arising out of or relating to any T. Rowe Price account of Rhea S. Needle, including but not limited to all causes of action asserted in the New FINRA Claim.

## COUNT II

### DECLARATORY JUDGMENT THAT DEFENDANTS' CLAIMS AGAINST T. ROWE PRICE ARE BARRED BY RES JUDICATA

52.     T. Rowe Price incorporates by reference the allegations in the preceding paragraphs as if the same were set forth fully herein.

53.     The Needles' causes of action asserted under the Securities Exchange Act of 1934, Rule 10b-5, and the Pennsylvania Unfair Trade Practices and Consumer Protection Law were dismissed by this Court in the First Litigation on August 19, 2022 for failure to state a claim on the grounds that the Needles lacked statutory standing to assert those claims. Those claims, which the Needles have reasserted in the New FINRA Claim, are barred by res judicata.

54.     The Needles' additional causes of action in the New FINRA Claim, for fraud and deceit, negligence, and breach of contract, are based on the same facts that were alleged in the First Litigation and could have been brought in the First Litigation. Because this Court adjudicated the merits of the Needles' substantive claims in the First Litigation, those additional claims are likewise barred by res judicata.

WHEREFORE, pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57, the plaintiffs respectfully request that the Court enter judgment declaring that all causes of action by Michael R. Needle and/or William A. Needle arising out of or relating to any T. Rowe Price account of Rhea S. Needle, including but not limited to all causes of action asserted in the New FINRA Claim, are barred by the doctrine of res judicata.

## COUNT III

### DECLARATORY JUDGMENT THAT DEFENDANTS'
### CLAIMS AGAINST T. ROWE PRICE ARE TIME-BARRED

55.    T. Rowe Price incorporates by reference the allegations in the preceding paragraphs as if the same were set forth fully herein.

56.    To the extent that any cause of action in the New FINRA Claim is asserted by the Needles in their individual capacities, that cause of action accrued no later than October 30, 2019.

57.    To the extent that any cause of action in the New FINRA Claim is asserted by the Needles in their purported capacities as administrators of Rhea Needle's estate, that cause of action accrued no later than September 18, 2018.

58.    The Needles filed the New FINRA Claim on October 30, 2025, more than six years after October 30, 2019 and more than seven years after September 18, 2018.

59.    All of the causes of action asserted by the Needles in the New FINRA Claim are barred by the applicable statutes of limitations.

WHEREFORE, pursuant to 28 U.S.C. § 2201 and Federal Rule of Civil Procedure 57, the plaintiffs respectfully request that the Court enter judgment declaring that the causes of action asserted by Michael R. Needle and William A. Needle in the New FINRA Claim—namely, their claims under the Securities and Exchange Act of 1934 and Rule 10b-5, under the Pennsylvania Unfair Trade Practices and Consumer Protection Law, for fraud and deceit, for negligence, and for breach of contract—are barred by the applicable statutes of limitations, regardless of whether any given claim is brought in their individual capacities or as administrators or personal representatives of the estate of Rhea S. Needle.

## COUNT IV

### INJUNCTIVE RELIEF

60.     T. Rowe Price incorporates by reference the allegations in the preceding paragraphs as if the same were set forth fully herein.

61.     In the absence of injunctive relief, T. Rowe Price will suffer irreparable harm by being forced to arbitrate claims that T. Rowe Price did not agree to arbitrate.

62.     In the absence of injunctive relief, T. Rowe Price will suffer irreparable harm by being forced to defend against claims that were already decided in its favor by this Court and that are barred by res judicata and by the applicable statutes of limitations.

63.     The injunctive relief requested by T. Rowe Price, as set forth below, will not harm the Needles more than the absence of injunctive relief would harm T. Rowe Price.

64.     The public interest favors granting injunctive relief because it would be contrary to the public interest to require parties to arbitrate claims in the absence of any agreement to arbitrate or to defend against claims that are barred by res judicata and by the applicable statutes of limitations.

65.     T. Rowe Price intends to file a motion for preliminary injunctive relief that, T. Rowe Price respectfully submits, will demonstrate a likelihood of success on the merits.

WHEREFORE, pursuant to the All Writs Act, 28 U.S.C. § 1651, and Federal Rule of Procedure 65, the plaintiffs respectfully request that the Court grant injunctive relief as follows:

(A)     A preliminary injunction to maintain the status quo by forbidding the Needles from maintaining or pursuing the New FINRA Claim until the Court has adjudicated T. Rowe Price's other claims for relief asserted in this Complaint; and

(B)     A permanent injunction:

(1)    requiring the Needles to discontinue the New FINRA Claim immediately, completely, and with finality;

(2)    forbidding the Needles from invoking or attempting to invoke FINRA arbitration against T. Rowe Price in the future based on or including any cause of action arising out of or relating to any T. Rowe Price account of Rhea S. Needle, whether in their individual capacities or as administrators or personal representatives of the estate of Rhea S. Needle, including but not limited to any cause of action that was or could have been asserted in the First Litigation or the New FINRA Claim; and

(2)    forbidding the Needles from asserting against T. Rowe Price, in any forum, any cause of action arising out of or relating to any T. Rowe Price account of Rhea S. Needle, whether in their individual capacities or as administrators or personal representatives of the estate of Rhea S. Needle, including but not limited to any cause of action that was or could have been asserted in the First Litigation or the New FINRA Claim.

Date: January 5, 2026

**PIERSON FERDINAND LLP**

/s/ *Jeffry W. Duffy*
Jeffry W. Duffy (No. 81670)
1650 Market Street, Suite 3600
Philadelphia, PA 19103
484-253-6661
jeffry.duffy@pierferd.com

Attorneys for Plaintiffs T. Rowe Price Group, Inc., T. Rowe Price Associates, Inc., and T. Rowe Price Investment Services, Inc.

15

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WILLIAM A. NEEDLE and | : | |
| MICHAEL R. NEEDLE, | : | |
| Plaintiffs | : | |
| | : | |
| vs. | : | |
| | : | CIVIL ACTION NO. 21-4786 |
| EDWARD DOSIK, Individually and as | : | |
| Personal Representative of Susan Dosik | : | |
| ESTATE OF SUSAN DOSIK, Deceased | : | |
| T. ROWE PRICE GROUP, INC., | : | |
| T. ROWE PRICE ASSOCIATES, INC. and | : | |
| T. ROWE PRICE INVESTMENT | : | |
| SERVICES, INC. | : | |
| Defendants | : | |

### AMENDED COMPLAINT

Plaintiffs, William A. Needle and Michael R. Needle, for their amended complaint against T. Rowe Price pursuant to Fed.R.Civ.P. 15(a)(1), state as follows:

### JURISDICTION AND VENUE

1.    This case concerns securities bought and sold in an IRA opened by Rhea Needle at T. Rowe Price on 1/11/02, assigned in part to Plaintiffs on her death on 9/18/18, and sold by Plaintiffs in March 2019.  It is brought under the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq., and Rule 10b-5, 17 C.F.R. §240.10b-5, the Pennsylvania Consumer Protection Law and Unfair Trade Practices Act, 73 P.S. §201-1 *et seq*, and other applicable state law.

2.    The Court has jurisdiction pursuant to 15 U.S.C. § 78aa, 28 U.S.C. §§ 1331, 1337 and 1367, and 28 U.S.C. §1332.  Plaintiffs are Pennsylvania citizens. Defendants are Maryland citizens. The amount in controversy exceeds $75,000, exclusive of interest and costs.

3.    Venue is proper in this district under 15 U.S.C. §78aa and 28 U.S.C. § 1391. Defendants transact business in this district and a substantial part of the events or omissions giving rise to the claims made herein occurred in this district.

## PARTIES

4.    Plaintiff, William A. Needle, is an individual domiciled in Pennsylvania.  At all relevant times, he was Rhea Needle's registered beneficiary, assignee, and successors in interest (within the meaning of 20 PA.C.S. §5601.3).

5.    Plaintiff, Michael R. Needle, is an individual domiciled in Pennsylvania.  At all relevant times, he was Rhea Needle's registered beneficiary, assignee, and successors in interest (within the meaning of 20 PA.C.S. §5601.3).

6.    Defendant, Edward Dosik ("Dosik"), is an individual domiciled in Maryland.  At all relevant times, Dosik was a licensed C.P.A. and purported to be a professional investor.

7.    Susan Dosik (*nee* Needle) was an individual domiciled in Maryland through her death on 8/24/21.  Dosik holds himself out as the Executor of her Estate.  Doc 16-30, p. 36.

8.    Defendant T. Rowe Price Group, Inc. is a Maryland corporation with its principal office at 100 East Pratt St., Baltimore, MD 21202.  It provides financial services to consumers.  It is one of the most profitable businesses in the world, attaining profit margins of 30.9% during the relevant time period.  It has offices at 1735 Market St., Philadelphia, PA 19103.

9.    Defendant T. Rowe Price Associates, Inc. is a Maryland corporation with its principal office at 100 East Pratt St., Baltimore, MD 21202.  It is a subsidiary of T. Rowe Price Group.

10.    Defendant, T. Rowe Price Investment Services, Inc. is a Maryland corporation with its principal office at 100 East Pratt St.,  Baltimore, MD 21202. It is a subsidiary of T. Rowe Price Associates, Inc., and a member of the Financial Industry Regulatory Authority ("FINRA").  The three T. Rowe Price defendants are hereinafter collectively referred to as "TRP."

## OPERATIVE FACTS

11.     Plaintiffs and Susan Dosik are the children of Lawrence I. Needle (5/22/25-12/8/01) and Rhea S. Needle (10/17/28-9/18/18).

12.     Prior to 12/8/01, Lawrence and Rhea Needle managed and invested their savings with advice and assistance from professionals at Citizens Bank (Jenkintown branch). On October 23, 1998, Rhea Needle appointed Michael R. Needle as her Agent under a General and Durable power of attorney. Doc 16-1.[1]

13.     Following Lawrence Needle's death, Rhea Needle owned 1173 Dixon Lane, Rydal PA (residence) and 5200 Boardwalk, Unit 11E, Ventnor NJ, was heir to Unit 16A7, 2401 Pennsylvania Avenue, Philadelphia, PA, a condominium belonging to Bertha F. Needle (Lawrence Needle's maternal aunt), had approximately $200,000 in savings, including three IRAs, and received her husband's social security benefits (the maximum).

14.     Rhea Needle's estate plan was to use her savings and the proceeds of any sale of real estate to generate supplemental income (in addition to SSI and IRA income), to support her modest life style in retirement and leave the principal to her children.

### Rhea Needle's TRP Accounts

15.     Around Christmas 2002, less than three weeks after the death of Lawrence Needle, Dosik and Susan Dosik visited Rhea Needle.  They pressured her to put her savings under Dosik's management.  Dosik represented to Rhea Needle (and William Needle, who was living with her) that he "was qualified and competent to manage her savings by virtue of his accounting background and experience in such matters, as well as his probity as a certified public account-ant." Doc 16-14, p. 2.  In fact, Dosik had virtually no such experience. Doc 16-28, pp. 73-74.

---

[1] Re-executed on October 10, 2017; Doc Id. 53304032 (Philadelphia Recorder of Deeds)

16.     In reliance on these representations, Rhea S. Needle signed a TRP power of attorney ("the POA") on 12/26/02 (Doc 16-2) appointing him as agent "to buy sell ... and trade in stocks, bonds, options, mutual funds and any other securities" in accounts to be opened for her.

17.     Dosik thereby falsely promised to manage her savings "with the care, competence and diligence ordinarily exercised by Agents in similar circumstances," 20 Pa.C.S. §5601.3(b), thus in accord with the prudent man standard, despite not knowing it. Doc 16-28, pp. 147-48.

18.     The POA included the following indemnity clause.

> I hereby agree to indemnify and hold you harmless from all loss, costs, indebtedness, and liabilities arising therefrom, the issuers of such securities, their transfer agents, broker-dealer firms which participate in such transactions, and their traders, and to pay promptly on demand any and all losses arising therefrom or debit balance due therefrom.

19.     On January 11, 2002, Dosik opened two TRP brokerage accounts for Rhea Needle aka Investor 994804080 (Doc 16-4, pp. 2, 10):

- "IRA FBO Rhea S Needle Trp Trust co Custodian Rollover Account Edward Dosik Trp/Poa" ("the IRA"), into which an existing IRA worth $61,154.81 was transferred and which identified Plaintiffs and Susan Dosik as registered beneficiaries

- "Edward B Dosik, Agent TRP/POA Dtd12/26/2001 Rhea S Needle," ("the Taxable Account"), into which $2,500 was deposited.

20.     Upon information and belief, Dosik signed TRP IRA brokerage and regular brokerage agreements substantially similar to those currently available on TRP's website (Docs 16-3, 16-4), including the following arbitration provisions (after 2007):

> I agree to settle by arbitration any controversy * * * relating to the Account Agreements, this account, and all accounts with [TRP] or transactions, or in any way arising from my brokerage relationship with [TRP] * * * Such arbitration will be conducted before and according to the arbitration rules of the Financial Industry Regulatory Authority (FINRA) unless the choice of another arbitrator forum is required by applicable state law.

.     21.     TRP did not furnish Rhea Needle with copies of these agreements in violation of SEC Rule 17a-3, 17 C.F.R. §240.17(a)-3(17(iii)[2] and has refused to supply them to Plaintiffs.

---

[2]"for each account with a natural person as a customer or owner," that TRP have a record "indicating that each customer or owner was furnished with a copy of each written agreement * * * pertaining to that account * * *"

22.     TRP never sent a copy of account statements to Rhea Needle as required by

FINRA Rule 2231.[3] Rather, TRP mailed such statements solely to Dosik (two from 2002

thorough 2013 and one thereafter), as follows:

| Period | Customer Statement | Agent Statement |
|--------|--------------------|-----------------|
| 2002-2005 | Edward Dosik Trp/ Poa Dtd 12/26/01 T Rowe Price Trust Co Cust For The IRA Of Rhea S Needle 1173 Dixon Lane Rydal PA 19046-1828 | Edward B Dosik 11221 Korman Dr Potomac MD 20854-2049 |
| 2006-2013 | Edward Dosik Trp/ Poa Dtd 12/26/01 T Rowe Price Trust Co Cust For The IRA Of Rhea S Needle 2401 Pennsylvania Apt 16A7 Philadelphia PA19130-3051 | Edward B Dosik 11221 Korman Dr Potomac MD 20854-2049 |
| 2014-2018 | Edward Dosik Trp/ Poa Dtd 12/26/01 T Rowe Price Trust Co Cust For The IRA Of Rhea S Needle 11221 Korman Dr Potomac MD 20854-2049 | None |

23.     Upon information and belief, TRP did not send agreements or statements to Rhea

Needle at Dosik's request, both when the accounts were opened on 1/11/02 and in August 2014.

24.     On January 25, 2002, $100,000 of Rhea Needle's savings was deposited in the

Taxable Account. This was substantially all of her savings other than two IRAs. Plaintiffs first

learned of this from a court-ordered Accounting by Dosik on October 30, 2019. Doc 16-18.

25.     On February 21, 2002, Dosik executed a TRP Form IRA Distribution Request.

Doc 16-5. This was used to divert IRA distributions from Rhea Needle to the Taxable

Account.TRP did not supply this form to Rhea Needle. Plaintiffs first learned of this diversion

from a court-ordered Accounting by Dosik on October 30, 2019. Doc 16-18.

_____

[3] This requires TRP "with a frequency of not less than once every calendar quarter, send a statement of account* * * * containing a description of any securities positions, money balances, or account activity to each customer whose account had a security position, money balance, or account activity during the period since the last such statement was sent"

5

26.     On May 15, 2002, Rhea Needle sold 5200 Boardwalk, Unit 11E.  At her request, $137,696.35 in net proceeds was paid to her for investment through Citizens Bank.

27.     Thereafter, Dosik and Susan Dosik pressured Rhea Needle to transfer these proceeds and two IRAs to the TRP accounts, as follows:

| Date | Description | Amount | To: |
|------|-------------|--------|-----|
| 20020518 | Ventnor Condo proceeds | $550.00 | Taxable |
| 20020701 | Ventnor Condo proceeds | $75,000.00 | Taxable |
| 20020819 | IRA rollover | $2,544.88 | IRA |
| 20030912 | IRA rollover Transamerica | $27,283.78 | IRA |
| 20030919 | Federated Equity Income Fund, Class B* | $2,822.65 | Taxable |
| 20030919 | Federated Strategic Income Fund, Class B* | $33,026.83 | Taxable |
| 20030919 | Federated Bond Fund, Class B* | $9,382.94 | Taxable |
| 20030919 | Checking, Citizens Investment Serv. Corp.* | $210.24 | Taxable |

*Purchased through Citizens Bank with net proceeds of Ventnor condominium sale

28.     Plaintiffs first learned of these transfers from the court-ordered Accounting by Dosik on October 30, 2019. Doc 16-18.

29.     On November 23, 2005, Bertha F. Needle died.  Her Will left 16A7 2401 Pennsylvania Ave. and other assets to Rhea Needle and appointed Michael Needle as Executor. Her other assets had dwindled to an amount insufficient to fund renovations needed by Unit 16A7, in which she had lived for decades without renovation.

30.     To preserve her estate plan, Rhea Needle asked Michael Needle to renovate Unit 16A7 as a retirement residence in order to maximize the sale proceeds of 1173 Dixon Lane left after the expense of renovating Unit 16A7 to save and generate supplemental retirement income.

31.     From February through August 2006, Michael Needle renovated Unit 16A7 at a cost which would leave all but $55,947.40[4] of the 1173 sale proceeds to generate supplemental retirement income.  He also negotiated and handled a sale of 1173. Rhea  Needle resigned her part time social worker position in June 2006 and moved to Unit 16A7 later that summer.

_____

[4]  Due to disputes with a creditor and regarding taxes, the precise amount would not be known until an Accounting and Adjudication in the Estate of Bertha F. Needle in 2008.

32.     On August 22, 2006, the sale of 1173 closed. Net proceeds were $355,235.92, leaving $299,288.52 to invest and generate supplemental retirement income.

33.     That same day, and for days before, Dosik and Susan Dosik urged Michael Needle, as Rhea Needle's Agent, to send the $355,235.92 to the Taxable Account. They falsely represented that prior contributions had been conservatively invested and Dosik would do likewise with the 1173 sale proceeds.  In fact, Dosik had (A) imprudently purchased odd lots of low-rated, high interest bonds at large, markups, (B) imprudently failed to diversify, using 75% of principal to buy financial and real estate stocks at real estate bubble prices, and (C) intended to continue on this course.  Plaintiffs first learned of this from the Accounting filed on 10/30/19.

34.     In reliance on these representations, Michael Needle as Rhea Needle's Agent under Doc 16-1, instructed the settlement clerk to wire $355,235.92 to the Taxable Account.

35.     On September 7, 2008, Michael Needle requested payment of $55,947.40 due from Rhea Needle to the Estate of Bertha F. Needle per an Adjudication confirming Michael Needle's Accounting as Executor.  Dosik falsely assured Michael Needle that the principal invested at TRP had been conserved and that the $55,947.40 would be paid quickly ($25,947.50 immediately, $15,000 on 10/15/08; and $15,000 on 11/15/08).

36.     In 2012 or 2013, Dosik became Rhea Needle's CPA after informing her and Michael Needle that her accountant at 2401 Pennsylvania Avenue was not doing a good job in preparing Rhea Needle's returns. Upon information and belief, he feared that the accountant would detect or warn Rhea Needle about possible mismanagement of her investments by Dosik.

37.     By August 2014, Rhea Needle, 85, was having difficulty paying expenses (e.g. condominium fee, real estate taxes, insurance premiums and credit card bills). To assist her with this, Dosik became a co-signer on her Wells Fargo checking account. Doc 16-28, pp. 169, 219.

38.     Around the same time, Dosik, without authority from Rhea Needle or Michael Needle, instructed TRP to reroute statements sent to Unit16A7 to his address.  Upon information and belief, this was to prevent Michael Needle, while caring for Rhea Needle at Unit 16A7, from seeing statements sent to Rhea Needle's address but in Dosik's name (or looking at them).

39.     In December 2014, Rhea Needle was diagnosed with vascular dementia, from which she had probably suffered since 2012.  Michael Needle had sole authority to make or authorize investment decisions and expenditures for her as her Agent under a General and Durable Power of Attorney.

40.     On or about December 12 and December 30 2014, Dosik and Susan Dosik represented to Plaintiffs that Rhea Needle had been "living on her dividends" and the principal invested at TRP had been conserved.   This was false.  Plaintiffs did not know this until the filing of the Accounting on 10/31/19.

41.     On July 13, 2015, Dosik and Susan Dosik visited Unit 16A7 and removed Rhea Needle's financial records (old bank statements and cancelled checks).  Dosik claimed that he needed them to prepare tax returns. Upon information and belief, he removed these records to prevent Michael Needle, while caring for Rhea Needle at Unit 16A7, from discovering large principal distributions to him or Susan Dosik.

42.     At that time, Dosik and Susan Dosik represented (falsely) to Plaintiffs that Rhea Needle had been "living on her dividends" and principal had been conserved.  They repeated this on 10/19/15 in Philadelphia and in an email on 2/10/16.

43.     In March 2016, Rhea Needle was no longer able to live at Unit 16A7 and moved into the memory care unit at Watermark at Logan Square. Dosik and Susan Dosik again represented (falsely) to Plaintiffs that Rhea Needle had been "living on her dividends" and principal had been conserved, in an email on 3/16/16 (Doc 16-7) and in Philadelphia on 3/26/16. These were false.  Plaintiffs did not know this until the filing of the Accounting on 10/31/19.

44.     In June 2016, Michael Needle put Unit16A7 up for sale.  Thereafter, Dosik and Susan Dosik represented (falsely) to Plaintiffs that Rhea Needle she had been "living on her dividends" and principal had been conserved, in phone calls in February 2017, May 2017, July 2017, August 2017, September 2017 and October 2017. These were false.  Plaintiffs did not know this until the filing of the Accounting on 10/31/19.

45.     On December 8, 2017, Michael Needle, as Rhea Needle's Agent, sold Unit 16A7, 2401 Pennsylvania Avenue. Dosik  represented that Rhea Needle had been "living on dividends" and enjoying large gains in 2016-17 bull market.  These were false.  Plaintiffs did not know this until the filing of the Accounting on 10/31/19.

46.     In reliance on these representations, Michael Needle agreed to invest the $481,415.87 in net proceeds in the Taxable Account.

47.     In 2018, TRP failed to request or obtain a "Trusted Contact" for Rhea Needle as required by an amendment to FINRA Rule 4512 to add subparagraph (a)(1)(F).[5]

48.     On September 18, 2018, Rhea Needle died. The IRA was assigned to Plaintiffs and Susan Dosik pursuant to Uniform Transfer on Death Security Registration Act adopted by Maryland **and** Pennsylvania[6] and did not pass to the Estate of Rhea Needle.

49.     Following Rhea Needle's death, Plaintiffs asked Dosik how much was in the TRP accounts and for statements.[7]  Dosik ignored them for over two months.

50.     On December 6, 2018, Plaintiffs demanded this information by letter. Doc 16-8.[8]

---

[5] Requiring TRP to make and keep a record of  the "name of and contact information for a trusted contact person age 18 or older who may be contacted about the customer's account".

[6] MD Trusts & Estates Code, §§ 16-101 -- 16-112; 20 Pa.C.S. §§ 6401-6413.

[7] 20 Pa.C.S. §5601.3(d) required Dosik to "disclose receipts, disbursements or transactions conducted on behalf of the principal" to a "successor in interest of the principal's estate."

[8] On October 9, 2018, Dosik probated a Will dated November 20. 1998.  Plaintiffs believe that this Will was revoked by a subsequent Will kept by Rhea S Needle in her safe deposit box.

51.    On December 13, 2018, Dosik promised to supply TRP statements.  He represented (falsely) that he needed to get them from TRP. Doc 16-9, pp. 1, 4.

52.    Dosik then insisted on meeting to divide up Rhea Needle's Estate prior to getting and supplying the statements. Doc 16-9, pp.  1, 6, 7. Plaintiffs declined to do so. *Id.,* pp. 3, 7, 9.

53.    Around December 24, 2018, Plaintiffs received year end TRP summaries (2002-17) and an October 2018 statement. These did not reveal amounts and dates of contributions by Rhea Needle to the TRP Accounts, distributions of principal or most of Dosik's trades.

54.    On December 26, 2018, Dosik filed a foreclosure action against Michael Needle for $216,563 (No. 181203205, C.P.Phila) based on a mortgage satisfied in 2006. Do 16-10.  He took a default judgment. This was vacated and the case dismissed with prejudice. Doc 16-11.

55.    In February 2019, Plaintiffs sent signed IRA Distribution Forms to TRP. Doc 22-1.  TRP created accounts entitled "T. Rowe Price Trust Co. Cust. For the IRA of Rhea S Needle (DCD) William A. Needle (Bene)"  and "T. Rowe Price Trust Co. Cust. For the IRA of Rhea S Needle (DCD) Michael R. Needle (Bene)."  Doc 22-2.

56.    In March 2019, each these accounts received one-third of the securities in the IRA. These securities were sold, with each Plaintiff receiving about $15,735. Doc 22-2.

57.    On March 14, 2019, Plaintiffs petitioned the Orphans Court of Philadelphia County to compel Dosik to  account as Agent and produce records of "receipts, disbursements or transactions * * *on behalf of the principal" as required by 20 Pa.C.S. §5601.3(d). Doc 16-12.

58.    On June 27, 2019, Dosik was ordered to "file an Account of his administration of Principal's estate from 12/26/2001 to 09/18/2018 * * * or before October 30, 2019."  Doc 16-18.

59.    After the hearing, Dosik produced TRP monthly statements sent to his house. These did not reveal amounts and dates of contributions by Rhea Needle to the TRP Accounts  and distributions of principal.  Dosik withheld the brokerage agreements executed on behalf of Rhea Needle, amendments thereto, and communications from and to TRP.

60.    On October 30, 2019, Plaintiffs received Dosik's Accounting. Doc 16-18. This revealed dates and amounts contributions by Rhea Needle to the TRP Accounts and principal, thus returns on investment (and whether Rhea Needle had been "living on her dividends"), none of which Plaintiffs knew or could have known before, as summarized in the following table:

|  | IRA | Taxable | Total |
|---|---|---|---|
| Total receipts | $160,739.34 | *$1,360,479.12 | $1,521,218.46 |
| Contributions | $90,983.47 | $1,066,814.70 | $1,157,798.17 |
| Interest/Dividend | $69,755.87 | $223,409.60 | $293,165.47 |
| Trading losses | ($45,623.53) | ($79,933.75) | #($125,557.28) |
| Income after losses | $24,132.34 | $143,475.85 | $167,608.19 |
| Yield on contributions | 1.58% | 0.80% | 0.86% |
| "General Disbursements" |  | $148,240.78 | $148,240.78 |
| "Principal to principal" |  | $436,085.13 | $436,085.13 |
| Balance on hand, 9/18/18 | $44,276.84 | $696,220.96[9] | $740,497.80 |

*Includes $70,254.82 in IRA distributions; #Includes. $35,595.81 stock market loss

The Swindle

61.    Given Rhea Needle's age, estate plan, and modest life style, prudence dictated investing 2/3's of her savings in income generating securities and 1/3 in equities and do so using professionally managed funds in order to diversify.  Doc 16-33.

62.    Instead, Dosik used $90,983.47 in transfers to the IRA to purchase (A) odd lots of low-rated, high interest bonds at large, undisclosed markups by TRP and (B) financial and real estate stocks at real estate bubble prices.  See Table One, compiled from the Accounting (Doc 16-18), appended hereto; Doc 16-26 (Paul Irwin Report).

63.    This "investment strategy" (so-called by Dosik) generated $69,755.87 in interest and dividends, an apparent 4.48% yield.  But $24,132.34 in losses due to purchases of odd-lots of bond and failure to diversify, resulted in a true 1.58% yield.  See Table Two appended hereto.

---

[9] Dosik sought to skim off over $100,000 of this $696,220.96 for himself by paying himself a $75,919 fee for "managing" Rhea Needle's investments and a $30,960 fee to prepare the Account.  Docs 16-17; 16-18, p. 11; Doc 16-30, pp. 38-39.  He also wants a $28,600 Executor Fee and has paid out $77,028.96 for his legal expenses in asserting claims against the Estate.                    .

11

64.    Dosik kept large amounts of principal (10-50%) in cash, Doc 16-26, 16-33.  This created a false impression of high yields while reducing yields.

65.    Dosik provided a spreadsheet to Rhea Needle (on 11/7/10) falsely representing that his bond investments were yielding over 5%, while withholding the October 2010 statement and causing TRP to do so.  Doc 16-28, pp. 54, 162-65.

66.    The foregoing, together with repeated misrepresentations that Rhea Needle was "living on her dividends" and principal was conserved, induced most of the $1,066,814.70 in contributions to the Taxable account, including $836,650.89 by Michael Needle as Rhea Needle's Agent under Doc 16-2.

67.    These contributions were used to purchase (A) odd lots of low-rated, high interest bonds from TRP at substantial markups, (B) financial and real estate stocks, many purchased during the midst of a real estate bubble and (C) speculative market timing in mutual funds.

68.    This generated $223,409.60 in interest/dividend income but an actual gain of $143,475.85 after trading losses, a poor return compared to funds in which Rhea Needle had invested through Citizens Bank, offered by TRP or generally available.  See Doc 16-33.

69.    The Accounting shows $148,239.28 in "General Disbursements" for living expenses and another $436,085.13 in "Distributions of Principal to Principal."  Doc 16-28, pp. 37-44.

70.    At least $400,000 is unexplained, despite Dosik's possession of bank records enabling him to do so (Doc 16-6) and well above income needed by Rhea Needle to pay her living expenses. Such unexplained distributions sharply increased after receipt of the Ventnor Condominium proceeds (in 04-05), receipt of the 1173 Dixon Lane sale proceeds (in 06-08), and Dosik becoming a signatory on Rhea Needle's Wells Fargo checking account:

| Year | Principal Contributions | | Principal Distributions | |
|---|---|---|---|---|
| | IRA | Taxable* | General | Other |
| 2002 | $63,709.69 | $178,050.00 | | $9,550.00 |
| 2003 | $27,283.78 | $45,442.66 | | $5,000.00 |
| 2004 | | $6,087.00 | | $19,727.66 |
| 2005 | | $290.29 | $7,461.00 | $13,117.66 |
| 2006 | | $355,235.02 | $6,893.00 | $40,058.83 |
| 2007 | | | $230.00 | $56,000.00 |
| 2008 | | | $40,929.66 | $46,000.00 |
| 2009 | | $293.86 | $18,943.00 | $22,000.00 |
| 2010 | | | | $18,500.00 |
| 2011 | | | | $26,000.00 |
| 2012 | | | $4,306.27 | $24,000.00 |
| 2013 | | | $4,773.82 | $16,000.00 |
| 2014 | | | $4,506.80 | $18,400.00 |
| 2015 | | | $21,207.45 | $10,141.98 |
| 2016 | | | $17,131.65 | $46,214.00 |
| 2017 | | $481,415.87 | $21,857.13 | $55,375.00 |
| 2018 | | | | $10,000.00 |
| TOTALS | $90,577.62 | $1,066,814.70 | $148,240.78 | $436,085.13 |

.

71.     Plaintiffs are informed and believe that much of this $436,085.13 was diverted to, misappropriated by and/or looted by Dosik and/or Susan Dosik.

72.     Prudent investment of the $1,157,798.17 contributed to the TRP accounts would have left approximately $1.1 million by September 2018, even assuming that the large distributions were legitimate. Doc 16-33. The IRA would have had $120,000.

73.     TRP helped Dosik conceal his misrepresentations by acceding to his request that it not send agreements and statements to Rhea Needle (or her Agent, Michael Needle) and profited from these misrepresentations via the sale of odd-lots of bonds at high mark-ups.

13

<u>Post-Accounting Orphans Court Proceedings</u>

74.     On December 2, 2019, Plaintiffs filed objections to the Accounting (Doc 16-19), the first three of which sought to surcharge Dosik for his malfeasance and misfeasance as Agent.

75.     Dosik moved to dismiss the surcharge objections with prejudice on the grounds that his transactions in the TRP accounts were known to and ratified by Rhea Needle. Doc 16-20.

76.     Plaintiffs answered that the transactions were not disclosed, much less ratified, because Rhea Needle (and her Agent, Michael Needle) never received a statement. Doc16-21.

77.     On February 12, 2020, the Orphans Court dismissed Plaintiffs' surcharge action without prejudice for "lack of standing." Doc 16-22.  (It later explained that only Dosik as Executor could seek a surcharge against Dosik as Agent. Doc 16-28, pp. 10-11).[10]

78.     Following the COVID layoff, Plaintiffs engaged Paul Irwin, an attorney and trust administration executive, to review the Accounting.  He concluded that Dosik lacked a coherent investment strategy and acted imprudently by overpaying for low-grade bonds, failing to diversify, and by attempting to time market swings in purchases and sales of equity funds.

79.     On September 21, 2021, Plaintiffs petitioned the Orphans Court to appoint them as temporary fiduciaries to bring claims by the Estate for such losses against TRP (and Dosik) under 20 Pa. C.S. § 4301,[11] alleging that "Dosik will not initiate an action against T. Rowe Price" due to a conflict of interest and contra the best interests of the Estate (to recover these losses).

---

[10] Stating that "if there is accounting in the estate, then we start all over again.  That's a separate set of objections.  That is what I am saying.  The objections that would be addressed with regard to the estate would be separate and apart.  Again, they would concern the executor's duties as executor.  But, you -- to -- to co-mingle any of his actions as power of attorney, they are two separate fiduciary responsibilities. … They would have to  be separated and dealt with separately"

[11] "Whenever and for so long as any fiduciary is in * * * a position of conflicting interest or in any situation where his functioning as a fiduciary for a temporary period may not be in the best interests of the estate, the court having jurisdiction over such fiduciary shall have the power in its discretion: * * * (2) to appoint a substituted fiduciary pro tem to act in place of the incapacitated fiduciary and to authorize the substituted fiduciary pro tem to exercise all or specified powers and discretion of the incapacitated fiduciary."

80.     On October 8, 2021, Dosik answered, confirming that he would not pursue the Estate's claims against TRP.  Appellants filed a  Reply to the "New Matter" in this Answer.

81.     On October 21, 2021, Paul Irwin issued an initial report that Dosik's "management was unprofessional and caused financial loss to Mrs. Needle."  Doc 16-26.  He subsequently quantified that financial loss as $331,726.38.  Doc 16-33.

82.     On October 30, 2021,  Plaintiffs filed this action to preserve their rights with respect to the IRA.  They do not seek damages in connection with the Taxable Account, which is property of the Estate of Rhea Needle. They expect to seek leave to amend to add the Estate's claims in the event they are granted relief under 20 Pa. C.S. § 4301.

83.     On November 3, 2021, the Orphans Court tried Dosik's claims for a $75,919 management commission and $30,960 preparation fee. Doc 16-28.  The same day, Dosik filed an Accounting as Executor. Doc 16-30.

84.     By Decree dated November 8, 2021, the Trial Court denied Dosik's $75,919 management fee.  Doc16-29. Plaintiffs appealed the Orphans Court's refusal to allow a surcharge action, its grant of a preparation fee, and other matters. Doc 16-32 (No. 2559 EDA 2021).

85.     Plaintiffs also filed objections to  Dosik's Account as Executor. Doc 16-31.  These were generally continued pending resolution of the appeal in 2559 EDA 2021.

86. By Order sent to the parties on November 19, 2021 but dated October 20, the Orphans Court *sua sponte* granted a demurrer to Plaintiffs' Petition for Appointment as Temporary Fiduciaries," stating that "the relief requested * * * is not within the scope of authority of this court."  Plaintiffs appealed this. (No 2625 EDA 2021).

**COUNT I**
**PURSUANT TO 9 U.S.C. §§3 & 4**
**AGAINST TRP, TRP ASSOCIATES, and TRP INVESTMENT SERVICES**

87.    Paragraphs 1 through 86 above are restated as if set forth in full herein.

88.    Plaintiffs are intended beneficiaries of the IRA brokerage agreement between Rhea Needle and TRP, including any provision for arbitration pursuant to FINRA Rules 12000 et seq,  and are entitled as such to arbitrate their claims against TRP in Counts III and V below and to a stay of this action with respect to such claims pursuant to 9 USC §3.

89.    Plaintiffs are customers of TRP within the meaning of FINRA Rule 12200, having established accounts with TRP as set forth in paragraphs 55 and 56 above and shown by Doc 22-1, and are entitled as such to arbitrate their claims against TRP in Counts III and V below pursuant to FINRA Rule 12200.  This provides:

12200. Arbitration Under an Arbitration Agreement or the Rules of FINRA

Parties must arbitrate a dispute under the Code if:

• Arbitration under the Code is either:

    (1) Required by a written agreement, or

    (2) Requested by the customer;

• The dispute is between a customer and a member or associated person of a member; and

• The dispute  arises in connection with the business activities of the member or the associated person, except disputes involving the insurance business activities of a member that is also an insurance company.

**COUNT II**
**PURSUANT TO 15 U.S.C. §78j & 17 C.F.R. §240.10b-5**
**AGAINST DOSIK AND THE ESTATE OF SUSAN DOSIK**

90.    Paragraphs 1 through 89 above are restated as if set forth in full herein.

91.    In violation of Section 10 of the Securities Exchange Act, 15 U.S.C. §78j, and Rule 10b-5(a), 17 C.F.R. §240.10b-5(a), Dosik used instrumentalities of interstate commerce to perpetrate an artifice or scheme to defraud in connection with the purchase and sale of the securities in the IRA, including Plaintiffs' sale of such securities in March 2019.

92.    In violation of Section 10 of the Securities Exchange Act, 15 U.S.C. §78j, and Rule 10b-5(b), 17 C.F.R. §240.10b-5(b), Dosik and Susan Dosik, used instrumentalities of interstate commerce to make knowingly false or materially misleading statements, as set forth in paragraphs 15, 17, 33, 36, 37, 40, 41, 42, 43, 44, 45, 46 and 65 above, in connection with the purchase and sale of the securities in the IRA, including Plaintiffs' sale of securities in March 2019.

93.    In violation of Section 10 of the Securities Exchange Act, 15 U.S.C. §78j, and Rule 10b-5(c), 17 C.F.R. §240.10b-5(c), Dosik and Susan Dosik used instrumentalities of interstate commerce to engage in acts, practices and a course of business which operated as a fraud or deceit in in connection with the purchase and sale of the securities in the IRA, including Plaintiffs' sale of securities in March 2019.

94.    Solely and proximately as a result of this conduct, Plaintiffs as sellers and/or as Rhea Needle's registered beneficiaries, assignees, and successors in interest have sustained damages in an amount to be determined by the trier of fact. Plaintiffs estimate this damage at $25,000 each.

### COUNT III
### PURSUANT TO 15 U.S.C. § 78j & 17 C.F.R. §240.10b-5
### AGAINST TRP, TRP ASSOCIATES, and TRP INVESTMENT SERVICES

95.    Paragraphs 1 through 94 above are restated as if set forth in full herein.

96.    In violation of Section 10 of the Securities Exchange Act, 15 U.S.C. §78j, and Rule 10b-5(a) thereunder, TRP used the facilities of national securities exchanges to perpetrate an "artifice or scheme to defraud in connection with the purchase and sale of the securities" in the IRA, including Plaintiffs' sale of such securities in March 2019.

97.    In violation of Section 10 of the Securities Exchange Act, 15 U.S.C. §78j, and Rule 10b-5(c) thereunder, TRP used the facilities of national securities exchanges to   engage in practices and a course of business which operated as a fraud or deceit in in connection with the purchase and sale of the securities in the IRA,  including Plaintiffs' sale of such securities in March 2019.

98.    Solely and proximately as a result of this conduct, Plaintiffs as sellers and/or as Rhea Needle's registered beneficiaries, assignees, and successors in interest suffered an ascertainable loss of money or property in an amount to be determined by the trier of fact. Plaintiffs estimate this damage at $25,000 each.

**COUNT IV**
**PURSUANT TO 73 P.S. §201-9.2**
<u>**AGAINST DOSIK**</u>

99.    Paragraphs 1 through 98 above are restated as if set forth in full herein.

100.    Dosik's activities as set forth above constitute "representing that * * * services are of a particular standard, quality or grade * * *if they are of another" and  "fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding" within the meaning of Sections 2(4)(vii) and  2(4)(xx) of the Pennsylvania Unfair Trade Practices Act, 73 P.S. §§ 201-2(4)(vii) & 201-2(4)(xx)  and violated Section 3 of that Act, 73 P.S. §201-3.

101.    Solely and proximately as a result of this conduct,  Plaintiffs, as Rhea Needle's registered beneficiaries, assignees, and successors in interest, suffered an ascertainable loss of money or property in an amount to be determined by the trier of fact.  Plaintiffs estimate this loss at $25,000 each.

102.    Plaintiffs are entitled to recover their actual damages and request three times their actual damages, costs and a reasonable attorney fee pursuant to Section 9.2 of the Act. 73 P.S. §201-9.2.

**COUNT V**
**PURSUANT TO 73 P.S. §201-9.2**
**AGAINST TRP, TRP ASSOCIATES, and TRP INVESTMENT SERVICES**

103.    Paragraphs 1 through 102 above are restated as if set forth in full herein.

104.    The activities of TRP as set forth above constitute "fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding" within the meaning of Section 2(4)(xx) of the Pennsylvania Unfair Trade Practices Act, 73 P.S. §201-2(4)(xx), and violated Section 3 of that Act, 73 P.S. §201-3.

105.    Solely and proximately as a result of this conduct,  Plaintiffs, as Rhea Needle's registered beneficiaries, assignees, and successors in interest, suffered an ascertainable loss of money or property in an amount to be determined by the trier of fact.  Plaintiffs estimate this loss at $25,000 each.

106    Plaintiffs are entitled to recover their actual damages and request three times their actual damages, costs and a reasonable attorney fee pursuant to Section 9.2 of the Act. 73 P.S. §201-9.2.

**COUNT VI**
**FRAUD AND DECEIT**
**<u>AGAINST DOSIK AND THE ESTATE  OF SUSAN DOSIK</u>**

107.    Paragraphs 1 through 106 above are restated as if set forth in full herein.

108.    Dosik and Susan Dosik statements and representations, as set forth in paragraphs 15, 17, 33, 36, 37, 40, 41, 42, 43, 44, 45, 46 and 65 above, in connection with the were knowingly false and made with the intent, purpose and effect of inducing Rhea Needle and her Agent Michael Needle into placing money in the IRA and Taxable Account and leaving it there.

109.    Solely and proximately as a result of this conduct,  Plaintiffs, as Rhea Needle's registered beneficiaries, assignees, and successors in interest, sustained damages in an amount to be determined by the trier of fact.  Plaintiffs estimate these damages at $25,000 each.

110.     Said conduct was malicious and warrants the imposition of punitive damages.

## COUNT VII
## BREACH OF FIDUCIARY DUTY
### AGAINST DOSIK

111.   Paragraphs 1 through 110 above are restated as if set forth in full herein.

112.   Dosik's conduct as set forth above breached his fiduciary duties to Rhea Needle

under 20 Pa.C.S. §5601.3, including:

- to "Act in accordance with the principal's reasonable expectations" [and] "in the principal's best interest,"

- to "act in good faith,"

- to "act loyally for the principal's benefit;,"

- to "act so as not to create a conflict of interest that impairs the agent's ability to act impartially in the principal's best interest,"

- to use "care, competence and diligence," commensurate with the "special skills  or expertise" which Dosik represented he had,

- to "keep a record of all receipts, disbursements and transactions made on  behalf of the principal," "to disclose receipts, disbursements or transactions conducted on behalf of the principal" AND

- to "preserve the principal's estate plan."

113.   Solely and proximately as a result of this conduct, Plaintiffs, as Rhea Needle's

registered beneficiaries, assignees, and successors in interest, sustained damages in an amount to

be determined by the trier of fact.  Plaintiffs estimate these damages at $25,000 each.

114.   Said conduct was malicious and warrants the imposition of punitive damages.

**COUNT VIII**
**NEGLIGENCE**
**AGAINST DOSIK**

115.    Paragraphs 1 through 114 above are restated as if set forth in full herein.

116.    Dosik's conduct as set forth above breached his duty of cares to Rhea Needle under 20 Pa.C.S. §5601.3 and common law by failing to have or employ the "special skills or expertise" in money management and investment he represented himself to have, as set forth in greater detail in the reports of Paul Irwin (Docs 16-28 and 16-33), which are incorporated by reference herein.

117.    Solely and proximately as a result of this conduct,  Rhea Needle and Plaintiffs, her beneficiaries, successors in interest and assigns, sustained damages in an amount to be determined by the trier of fact.  Plaintiffs estimate these damages at $25,000 each.

WHEREFORE, Plaintiffs request the following relief:

    A. A stay and/or order compelling arbitration pursuant to 9 U.S.C. §§ 3 and/or 4.

    B. Trial by jury on all counts triable to a jury

    C. Judgment in their favor and against defendants for all damages found to have been sustained by them.

    D. Treble damages under Counts IV and V pursuant to 73 P.S. §201-9.2.

    E. Costs and a reasonable attorney's fees under Counts IV and V pursuant to 73 P.S. §201-9.2.

    F. Punitive Damages under Counts VI and VII (as to Dosik and the Estate of Susan Dosik only)

    G. Such other relief as may be necessary and/or proper

Dated: January 28, 2021

**Rothberg, Federman & Hollister, P.C.**

By:_/s/ Michael T. Hollister_
Michael T. Hollister
Attorney ID 87083
3103 Hulmeville Road
Suite 200
Bensalem, PA 19020
215-244-4224
Attorney for Plaintiffs

# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **WILLIAM A. NEEDLE,** *et al.* | : | **CIVIL ACTION** |
| *Plaintiffs* | : | |
| | : | **NO. 21-4786** |
| **v.** | : | |
| | : | |
| **T ROWE PRICE GROUP INC.,** | : | |
| *et al.* | : | |
| *Defendants* | : | |

# ORDER

**AND NOW**, this 28th day of March 2022, upon consideration of the *motion for preliminary injunction enjoining arbitration* filed by Defendants T. Rowe Price Associates, Inc., T. Rowe Price Group, Inc., and T. Rowe Price Investment Services, Inc. (collectively, "T. Rowe Price"), [ECF 31], the response in opposition filed by Plaintiffs Michael R. Needle and William A. Needle (collectively, "Plaintiffs"), [ECF 45], and the reply filed by T. Rowe Price, [ECF 53],  and for the reasons set forth in the accompanying Memorandum Opinion, it is hereby **ORDERED** that the motion is **GRANTED**.  Accordingly, Plaintiffs are hereby **ENJOINED** from proceeding with the arbitration proceedings pending before the Financial Industry Regulatory Authority and/or from filing any further arbitration pending the resolution of the issue of arbitrability in this matter.

**BY THE COURT:**

/s/ *Nitza I. Quiñones Alejandro*
**NITZA I. QUIÑONES ALEJANDRO**
*Judge, United States District Court*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **WILLIAM A. NEEDLE,** *et al.* | : | **CIVIL ACTION** |
| *Plaintiffs* | : | |
| | : | **NO. 21-4786** |
| **v.** | : | |
| | : | |
| **T ROWE PRICE GROUP INC.,** | : | |
| *et al.* | : | |
| *Defendants* | : | |

NITZA I. QUIÑONES ALEJANDRO, J.                                      MARCH 28, 2022

## MEMORANDUM OPINION

### INTRODUCTION

Plaintiffs William A. and Michael R. Needle (collectively, "Plaintiffs") are the sons of Rhea Needle, deceased. Defendants T. Rowe Price Group, Inc., T. Rowe Price Associates, Inc., and T. Rowe Price Investment Services, Inc., (collectively, "T. Rowe Price") together run a brokerage firm that provides investment management and retirement services. Defendant Edward Dosik ("Dosik") is Rhea Needle's son-in-law and was married to her daughter Susan, sister of Plaintiffs. Susan is now deceased, and Dosik serves as the personal representative of her estate.

In 2001, Rhea Needle executed a power of attorney authorizing Dosik to open, on her behalf, an individual retirement account (the "IRA") with T. Rowe Price; said account was opened in 2002. Plaintiff Michael R. Needle, Plaintiff William A. Needle, and Susan Needle Dosik were named beneficiaries of the IRA in the event of Rhea Needle's death. Among the documents signed to open the IRA was a Brokerage IRA New Account Form (the "New Account Form"), which contained, *inter alia*, an arbitration clause (the "Arbitration Clause"). The Arbitration Clause provides, in relevant part:

> Predispute Arbitration Clause.  I agree to settle by arbitration any controversy between myself and Price [T. Rowe Price Investment Services, Inc.], its parent, or affiliates, and/or any such officers, directors, employees, agents or Price's clearing broker, relating to the Account Agreements, my account, or account transactions, or in any way arising from my brokerage relationship with Price . . . .

(New Account Form, Defs.' Mot. for Prelim. Inj. Ex. B-1, ECF 31, at p. 64).

Dosik managed Rhea Needle's IRA until Rhea Needle's death on September 18, 2018.  As a result of her death, the ownership of a proportional share of the securities held in the IRA transferred to each of the three named beneficiates pursuant to the Uniform Transfer on Death Security Registration Act.  To effectuate said transfer, Plaintiffs completed IRA Distribution Forms, requesting that T. Rowe Price distribute all of the securities in the IRA equally to the three named beneficiaries.  Consistent with the IRA Distribution Forms, T. Rowe Price created separate beneficiary accounts and transferred to Plaintiffs their respective shares of the securities held in the IRA to the beneficiary accounts.  Thereafter, in March 2019, the shares were sold for cash, and T. Rowe Price issued checks to the named beneficiaries as the payout of the proceeds and closed the beneficiary accounts.

Believing that the IRA proceeds should have been more than what was distributed, Plaintiffs filed this action against T. Rowe Price alleging securities fraud under the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.*, and Rule 10b-5, 17 C.F.R. § 240.10b-5, and the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Cons. Stat. §§ 201-1 *et seq.*  Plaintiffs also assert claims against Dosik for his alleged mismanagement of the IRA.  In their amended complaint, Plaintiffs also seek an order to stay this matter and compel T. Rowe Price to arbitrate their claims pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 3, 4.  [ECF 23].

Before this Court is T. Rowe Price's *motion for a preliminary injunction enjoining arbitration*, [ECF 31], filed pursuant to Federal Rule of Civil Procedure ("Rule") 65, Plaintiffs'

response in opposition thereto, [ECF 45], and T. Rowe Price's reply, [ECF 53]. The issues raised in the motion are fully briefed and are ripe for disposition. For the reasons set forth herein, T. Rowe Price's motion for a preliminary injunction is granted, and Plaintiffs are enjoined from proceeding with the arbitration proceeding pending against T. Rowe Price. [1]

## LEGAL STANDARD

In the underlying motion for a preliminary injunction, T. Rowe Price seeks an order to enjoin Plaintiffs from proceeding with an arbitration before the Financial Industry Regulatory Authority ("FINRA").[2, 3]  Plaintiffs oppose the motion.

Rule 65 governs the issuance of a preliminary injunction. The United States Court of Appeals for the Third Circuit has interpreted this Rule to require, in order for a court to grant an injunction, the movant to show that "(1) it has a likelihood of success on the merits, (2) it will suffer irreparable harm if the injunction is denied, (3) granting preliminary relief will not result in even greater harm to the nonmoving party, and (4) the public interest favors such relief." *Rogers v. Corbett*, 468 F.3d 188, 192 (3d Cir. 2006). The movant carries the burden to establish each element in its favor. *P.C. Yonkers, Inc. v. Celebrations the Party Seasonal Superstore, LLC*, 428 F.3d 504, 508 (3d Cir. 2005). The first two factors are the "most critical": "If these gateway

---

[1]     This Court also considered Plaintiffs' brief in support of their motion for stay, [ECF 33], and T. Rowe Price's response in opposition, [ECF 46].

[2]     The Financial Industry Regulatory Authority ("FINRA") is a self-regulatory organization that exercises oversight over securities firms. *Reading Health Sys. v. Bear Stearns & Co.*, 900 F.3d 87, 90 (3d Cir. 2018) (citing *Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 737 (9th Cir. 2014)). FINRA is statutorily authorized by Congress and works under the supervision of the Securities and Exchange Commission.

[3]     T. Rowe Price initially sought to enjoin Plaintiffs from initiating FINRA arbitration. However, one week after the motion was filed, Plaintiffs filed to arbitrate this matter before the FINRA. [*See* ECF 33-11]. Considering these events, this Court will evaluate T. Rowe Price's motion as requesting an order to enjoin Plaintiffs from proceeding with their pending FINRA arbitration until this Court has definitively ruled on the arbitrability of the dispute.

factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017).

A court may rule on a motion for a preliminary injunction without holding an evidentiary hearing where there are no relevant facts in dispute. *See Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 719 n.16 (3d Cir. 2004) ("[W]here the motion turns on a disputed factual issue, an evidentiary hearing is ordinarily required."). Here, the facts relevant to the instant motion are not in dispute and, therefore, a hearing is not necessary to address the motion

## DISCUSSION

T. Rowe Price argues that it has met each of the four factors for a preliminary injunction under Rule 65 enjoining Plaintiffs from proceeding with their FINRA arbitration. This Court agrees.

### *Likelihood of Success on the Merits*

In its motion, T. Rowe Price argues, *inter alia*, that it is likely to succeed on the merits of its defense to Plaintiffs' claim to compel arbitration because there is no arbitration agreement between them or a statute that requires T. Rowe Price to arbitrate Plaintiffs' claims. Specifically, T. Rowe Price argues (1) that Plaintiffs were not and are not T. Rowe Price's "customers" with respect to Rhea Needle's IRA under FINRA Rule 12200, and (2) that no written arbitration agreement exists between Plaintiffs and T. Rowe Price that would compel arbitration. In their opposition, Plaintiffs posit two arguments: that they may enforce arbitration under FINRA Rule 12200 because they are T. Rowe Price's "customers" or, alternatively, that they may enforce to the Arbitration Clause of the New Account Form as the assignees of Rhea Needle's rights and as third-party beneficiaries of the contract. These arguments will be addressed in turn.

4

*1.  Determination of Customer Under FINRA Rule 12200*

In view of T. Rowe Price's argument that Plaintiffs do not qualify as its "customers," this Court has considered Rule 12200, which requires a FINRA member, such as T. Rowe Price,[4] to arbitrate certain claims brought against it by a "customer."  *Reading Health Sys.*, 900 F.3d at 90. More specifically, the Rule requires a member to arbitrate a dispute if (1) arbitration is "[r]equested by the customer," (2) "[t]he dispute is between a customer and a member," and (3) "[t]he dispute arises in connection with the business activities of the member."

Plaintiffs contend that they can be considered T. Rowe Price's "customers" because they held beneficiary accounts set up by T. Rowe Price to effectuate the transfer of funds from the IRA to Plaintiffs.  In support, Plaintiffs cite *Stagliano v. O.N. Equity Sales Co.*, wherein a court in this district defined "customer" as "one who either (1) purchases a good or service from a FINRA member; or (2) has an account with a FINRA member."  2020 WL 3172891, at *4 (E.D. Pa. June 15, 2020) (citing *Citigroup Glob. Mkts. Inc. v. Abbar*, 761 F.3d 268, 276 (2d Cir. 2014)).

Importantly, Rule 12200 requires arbitration *only* where the dispute arises "in connection with the business activities of the member."  Courts have interpreted this third requirement of Rule 12200 as only requiring arbitration of disputes "arising from the account" of the customer.  *See, e.g.*, *Citigroup Glob. Mkts.*, 761 F.3d at 275.  Regardless of whether Plaintiffs would be considered customers for another purpose, the dispute Plaintiffs presently seek to arbitrate against T. Rowe Price does not concern *their own* personal or beneficiary accounts, through which they arguably could be considered T. Rowe Price's "customers."  Rather, Plaintiffs seek to compel the arbitration of disputes that allegedly arose from the management of their mother's IRA account.  As T. Rowe

---

[4]    Only T. Rowe Price Investment Services, Inc., is a member of FINRA.  However, for purposes of clarity and consistency, this Court will continue to refer to T. Rowe Price, collectively, throughout its analysis.

Price argues, allowing a perceived customer to invoke Rule 12200 to arbitrate disputes arising from *any* customer's account would have "no apparent limiting principle." (Defs.' Br., ECF 31, at p. 14). This Court agrees and finds that, at this preliminary stage, T. Rowe Price has shown a likelihood of success on the merits of its defense to Plaintiffs' arbitration claim.

### 2. *Written Arbitration Agreement*

Plaintiffs also argue that, as third-party beneficiaries or, alternatively, as assignees of Rhea Needle's rights following her death, they may compel T. Rowe Price to arbitrate Plaintiffs' claims under the Arbitration Clause in Rhea Needle's IRA account opening documents. Plaintiffs are mistaken. The Arbitration Clause provides, *in part*, that the account holder—Rhea Needle— "agrees to settle by arbitration any controversy between myself and [T. Rowe] Price." (New Account Form, ECF 31, at p. 64). It is undisputed that Plaintiffs are not parties to the underlying contract, between T. Rowe Price and Rhea Needle, that contains the Arbitration Clause. Nonetheless, under certain circumstances, nonparties to an agreement to arbitrate may bind a signatory party "when traditional principles of state law allow a contract to be enforced by or against nonparties[.]" *Kipp v. Weyerhauser Co.*, 354 F. Supp. 3d 622, 626 (E.D. Pa. 2018) (citing *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009)) (other citations, quotation marks, and alterations omitted). Such traditional principles may include, *inter alia*, third-party beneficiary and assignment.

Plaintiffs contend that they are the "intended beneficiaries" of T. Rowe Price's agreement with Rhea Needle and, therefore, they can bind T. Rowe Price to arbitrate their claims. In general, a party cannot be required to submit to the arbitration of a dispute that the party has not agreed to arbitrate. *See Dougherty v. VFG, LLC*, 118 F. Supp. 3d 699, 711 (E.D. Pa. 2015) (citing *AT & T Tech. v. Commc'n Workers of Am.*, 475 U.S. 643, 648 (1986). "[C]ourts have been willing to apply

6

third party beneficiary law in examining the contractual standing of a non-signatory party to a dispute, provided there is an expression of the requisite intent between the third party and the plaintiff to arbitrate their claims."  *In re Prudential Ins. Co. of Am. Sales Prac. Litig. All Agent Actions*, 133 F.3d 225, 229 (3d Cir. 1998) (citations omitted).  Here, there is no such expression of the requisite intent between Plaintiffs and T. Rowe Price.  To the contrary, the Arbitration Clause relied on only provides that Rhea Needle agreed to arbitrate "any controversy ***between myself and [T. Rowe] Price*.**"  (New Account Form, ECF 31, at p. 64 (emphasis added)).  Thus, the Arbitration Clause provides no expression of intent to arbitrate that could extend to claims between Plaintiffs and T. Rowe Price.  Absent any such expression of intent to arbitrate, Plaintiffs' reliance on the Arbitration Clause is unfounded.

Plaintiffs also argue that they can invoke the Arbitration Clause as the assignees of Rhea Needle's rights under her contract with T. Rowe Price.  Specifically, Plaintiffs contend that upon Rhea Needle's death, her rights under the New Account Form passed to her named beneficiaries of the IRA—Plaintiffs and their sister—pursuant to the Uniform Transfer on Death Security Registration Act ("UTDSRA"), a statute adopted in Pennsylvania.  20 Pa. Cons. Stat. §§ 6401–13. Plaintiffs are again mistaken.

The UTDSRA provides, in relevant part:  "On death of a sole owner or the last to die of all multiple owners, ownership of securities registered in beneficiary form passes to the beneficiary or beneficiaries who survive all owners."  20 Pa. Cons. Stat. § 6407.  It is clear from the plain language of the UTDSRA that the statute concerns the transfer of the actual securities from an original owner to a named beneficiary upon the owner's death, not the transfer of rights under the underlying contract.  *See id.* § 6407 ("On death of a sole owner . . . , ownership ***of securities*** registered in beneficiary form passes to the beneficiary or beneficiaries who survive all owners."

(emphasis added)).  As such, under the UTDSRA, upon Rhea Needle's death, Plaintiffs, as the named beneficiaries, became the owners of the *securities* held in Rhea Needle's account; they did not become owners of, or the "assignees" to, any rights and obligations associated with Rhea Needle's IRA.[5]

For the foregoing reasons, T. Rowe Price has demonstrated a likelihood of success on the merits of its defense to Plaintiffs' claim to compel arbitration.

### Irreparable Harm

"[F]orcing a party to arbitrate a claim it did not agree to arbitrate constitutes *per se* irreparable harm."  *AT & T Mobility LLC v. Smith*, 2011 WL 5924460, at *9 (E.D. Pa. Oct. 7, 2011) (citing *PaineWebber Inc. v. Hartmann*, 921 F.3d 507, 514–15 (3d Cir. 1990), *overruled on other grounds by Howsam v. Dean Witter Reynolds*, 537 U.S. 79 (2002)).  Having determined that T. Rowe Price never agreed to arbitrate any claims brought by Plaintiffs, this factor is satisfied.

### Balance of Hardships

T. Rowe Price also argues that an injunction halting the FINRA arbitration will not harm Plaintiffs, as they commenced this lawsuit prior to initiating the FINRA arbitration.  This Court agrees.  A preliminary injunction to prevent Plaintiffs from proceeding with their arbitration will, at most, delay the resolution of Plaintiffs' securities fraud claims.  Notably, Plaintiffs initiated this lawsuit against T. Rowe Price alleging securities fraud, and later amended the complaint to seek an order to compel arbitration.  It is fair to assume that Plaintiffs intended for this Court to rule on the arbitrability of their claims as a threshold matter.  Conversely, T. Rowe Price would be prejudiced if forced to continue defending against Plaintiffs' claims in arbitration, given that the

---

[5]     T. Rowe Price anticipatorily argues that any argument by Plaintiffs premised on equitable estoppel would be unsupported.  Plaintiffs have not raised any equitable estoppel argument.  Therefore, this Court will not address it.

arbitrability of the claims is contested.  Thus, the potential harm T. Rowe Price could suffer if this Court did not issue an injunction outweighs any potential delay that Plaintiffs might experience.  For these reasons, this Court finds that the balance of the parties' hardships weighs in favor of granting the requested relief.

### Public Interest

Where the movant "demonstrates both a likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor" the movant.  *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994).  Further, "[w]hen the reach of an injunction is narrow, limited only to the parties, and has no impact on non-parties, the public interest will be at most a neutral factor in the analysis[.]"  *Macquarie Holdings USA Inc. v. Rode*, 2012 WL 12882417, at *4 (C.D. Cal. Jan. 17, 2012) (citing *Stormans, Inc. v. Selecky*, 586 F.3d 1108, 1138–39 (9th Cir. 2009)).  Here, T. Rowe Price has demonstrated a likelihood of success on the merits and that it would be irreparably harmed if forced to arbitrate Plaintiffs' claims.  An injunction would be narrow and limited only to T. Rowe Price and Plaintiffs.  As such, this Court finds that the public interest favors granting the motion for a preliminary injunction.

## CONCLUSION

For the foregoing reasons, the four cited factors for relief under Rule 65, when considered together, weigh in favor of granting the requested preliminary injunction.  *See Reilly*, 858 F.3d at 179 (3d Cir. 2017).  Accordingly, Plaintiffs are enjoined from proceeding with their FINRA arbitration against T. Rowe Price until this Court has ruled definitively on the arbitrability of the dispute.  An Order consistent with this Memorandum Opinion follows.

*NITZA I. QUIÑONES ALEJANDRO*, U.S.D.C. J.

# EXHIBIT C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **WILLIAM A. NEEDLE,** *et al.* | : | **CIVIL ACTION** |
| *Plaintiffs* | : | |
| | : | **NO. 21-4786** |
| **v.** | : | |
| | : | |
| **T ROWE PRICE GROUP INC.,** | : | |
| *et al.* | : | |
| *Defendants* | : | |

## ORDER

**AND NOW**, this 19th day of August 2022, upon consideration of the *motion to dismiss amended complaint*, [ECF 32], filed by Defendants T. Rowe Price Group, Inc., T. Rowe Price Associates, Inc., and T. Rowe Price Investment Services, Inc., (collectively, "T. Rowe Price"), Plaintiffs William A. Needle's and Michael R. Needle's (collectively, "Plaintiffs") joint response in opposition, [ECF 43], T. Rowe Price's reply, [ECF 50], T. Rowe Price's supplemental brief, [ECF 76], and the allegations in the amended complaint, [ECF 23], it is hereby **ORDERED** that, for the reasons set forth in the accompanying Memorandum Opinion, the motion to dismiss is **GRANTED**, and the claims at Counts I, III, and V of the amended complaint against T. Rowe Price are **DISMISSED**.

BY THE COURT:

*/s/ Nitza I. Quiñones Alejandro*
**NITZA I. QUIÑONES ALEJANDRO**
*Judge, United States District Court*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **WILLIAM A. NEEDLE,** *et al.* | : | **CIVIL ACTION** |
| *Plaintiffs* | : | |
| | : | **NO. 21-4786** |
| **v.** | : | |
| | : | |
| **T ROWE PRICE GROUP INC.,** *et al.* | : | |
| *Defendants* | : | |

NITZA I. QUIÑONES ALEJANDRO, J.                                         AUGUST 19, 2022

## MEMORANDUM OPINION

**INTRODUCTION**

Plaintiffs William A. Needle and Michael R. Needle (collectively, "Plaintiffs") commenced this civil action against, *inter alia*, Defendants T. Rowe Price Group, Inc., T. Rowe Price Associates, Inc., and T. Rowe Price Investment Services, Inc., (collectively, "T. Rowe Price")[1] premised on claims related to the Individual Retirement Account (the "IRA") of their mother, Rhea Needle. Against T. Rowe Price, Plaintiffs assert a claim to compel arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 3 and 4; and claims for violation of the Securities Exchange Act of 1934 (the "SEA"), 15 U.S.C. § 78a *et seq.*, and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5; and the Pennsylvania Unfair Trade Practices and Consumer Protection Law (the "UTPCPL"), 73 Pa. Cons. Stat. § 201-1 *et seq.* [ECF 23].

In February 2022, Plaintiffs initiated arbitration proceedings against T. Rowe Price before the Financial Industry Regulatory Authority ("FINRA"). On February 10, 2022, T. Rowe Price

---

[1]    The Defendants in this matter are T. Rowe Price and Edward Dosik ("Dosik"), in his individual capacity and in his capacity as the Executor of the Estate of Susan Dosik. Plaintiffs' claims against Dosik in his individual capacity were dismissed by Order and Memorandum Opinion dated August 15, 2022, [ECF 78, 79], and the claims against the Estate of Susan Dosik were dismissed by Order dated August 19, 2022, [ECF 80].

moved for a preliminary injunction to prevent Plaintiffs from continuing the FINRA arbitration until the issue of arbitrability was definitively resolved by this Court. [ECF 31]. On March 28, 2022, this Court granted the motion and preliminarily enjoined Plaintiffs from proceeding with arbitration pending a final resolution of the issue of arbitrability. [ECF 62, 63].

Before this Court are T. Rowe Price's motion to dismiss all claims against them filed pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6), [ECF 32], Plaintiffs' response in opposition, [ECF 43], T. Rowe Price's reply, [ECF 50], and T. Rowe Price's supplemental brief, [ECF 76]. The issues raised in the motion have been fully briefed and are ripe for disposition. For the reasons set forth, T. Rowe Price's motion to dismiss is granted.

**BACKGROUND**

When ruling on a motion to dismiss, a court must accept all well-pleaded facts in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). The facts relevant to T. Rowe Price's motion to dismiss are summarized as follows:[2]

> Plaintiffs are the sons of Rhea Needle, deceased. T. Rowe Price runs a brokerage firm that provides investment management and retirement services to consumers. Dosik is Rhea Needle's son-in-law who was married to her daughter, Susan (Plaintiffs' sister). Susan is now deceased, and Dosik serves as Executor of her estate.

---

[2]    These facts are drawn from Plaintiffs' amended complaint, [ECF 23], and the exhibits referenced therein. This Court has also considered matters of public record in connection with the parties' proceedings before the Philadelphia Orphans' Court and Superior Court of Pennsylvania. *See Toscano v. Conn. Gen. Life Ins. Co.*, 288 F. App'x 36, 38 (3d Cir. 2008) ("[A] court may take judicial notice of the record from a previous court proceeding between the parties.") (citing *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 416 n.3 (3d Cir. 1988)).

*Rhea Needle's T. Rowe Price Brokerage Accounts*

On December 26, 2001,[3] Rhea Needle executed a general power of attorney (the "Power of Attorney") authorizing Dosik to open investment accounts and to buy, sell, and trade securities on her behalf.  Pursuant to the Power of Attorney and in Rhea Needle's name, Dosik opened two accounts with T. Rowe Price—an Individual Retirement Account (the "IRA") and a brokerage account Plaintiffs call the "Taxable Account."[4]  Plaintiffs and Susan were the three named beneficiaries of the IRA in the event of Rhea Needle's death.  Among the documents signed to open the IRA was a Brokerage IRA New Account Form (the "New Account Form"), which contained, *inter alia*, an arbitration clause (the "Arbitration Clause").  The Arbitration Clause provides, in relevant part:

> Predispute Arbitration Clause.  I agree to settle by arbitration any controversy between myself and Price [T. Rowe Price Investment Services, Inc.], its parent, or affiliates, and/or any such officers, directors, employees, agents or Price's clearing broker, relating to the Account Agreements, my account, or account transactions, or in any way arising from my brokerage relationship with Price . . . .

(New Account Form, T. Rowe Price's Mot. Ex. B-1, ECF 32, at p. 67).

Dosik managed the IRA until Rhea Needle's death on September 18, 2018.  As a result of her death, the ownership of a proportional share of the securities held in the IRA transferred to each of the three named beneficiaries pursuant to the Uniform Transfer on Death Security Registration Act.  To effectuate said transfer, each beneficiary completed IRA Distribution Forms, requesting that T. Rowe Price distribute all of the securities in the IRA equally to each one.  Consistent with the IRA Distribution Forms, T. Rowe Price created separate beneficiary accounts and transferred each named beneficiary's respective shares of the securities held in the IRA directly to the beneficiary accounts.  Thereafter, in March 2019, the shares were sold for cash, and T. Rowe Price issued checks to each named beneficiary as the payout of the proceeds and closed the beneficiary accounts.

*Orphans' Court Proceedings*

Dissatisfied with the amount received, On March 14, 2019, Plaintiffs filed a petition with the Philadelphia Orphans' Court to compel Dosik to file an

---

[3]     Plaintiffs' amended complaint indicates that Rhea Needle executed the Power of Attorney in 2002. (Am. Compl., ECF 23, ¶¶ 15–16).  However, the document itself, which Plaintiffs reference in the amended complaint, is dated December 26, 2001.  (General Power of Att'y & Full Trading Authorization With Privilege to Withdraw Money and/or Securities, ECF 16-2, at p. 1).

[4]     Dosik's management of the Taxable Account is not at issue here.  In their amended complaint, Plaintiffs note that any claims with respect to the Taxable Account belong to the Estate of Rhea Needle, of which Dosik serves as the Executor.

3

accounting of his administration of Rhea Needle's financial matters, as her agent under the Power of Attorney. On October 30, 2019, Plaintiffs received the requested accounting from Dosik and subsequently filed six objections to the accounting. In three of these objections, Plaintiffs sought to surcharge Dosik for his actions as Rhea Needle's agent, arguing that Dosik had violated his duties under 20 Pa. Cons. Stat. § 5601.3(d). On February 12, 2020, the Orphans' Court dismissed the three objections seeking the surcharge on the grounds that Plaintiffs lacked standing, leaving the other objections pending.

On September 21, 2021, Plaintiffs petitioned the Orphans' Court to appoint them as temporary fiduciaries of the Estate of Rhea Needle in order to bring claims against T. Rowe Price and Dosik on behalf of the Estate. By Decree dated October 20, 2021, the Orphans' Court denied Plaintiffs' petition to be appointed as temporary fiduciaries, citing a lack of authority. Plaintiffs appealed that decision to the Superior Court of Pennsylvania, where the issue remains pending as of August 18, 2022. On October 30, 2021, Plaintiffs commenced this federal action "to preserve their rights with respect to the IRA." (Am. Compl., ECF 23, ¶ 82).

On November 8, 2021, the Orphans' Court issued a Decree denying two and granting one of Plaintiffs' remaining three objections to Dosik's accounting. This Decree also rendered final the February 12, 2020 Order dismissing Plaintiffs' first three objections. On December 3, 2021, Plaintiffs appealed the dismissals of the five objections to the Superior Court.

On April 22, 2022, the Superior Court issued an Order quashing Plaintiffs' appeal with respect to the dismissal of the first three objections for lack of standing and quashing Plaintiffs' appeal with respect to one other objection. Plaintiffs did not appeal the quashal, and the time to do so has expired.

**LEGAL STANDARD**

When considering a motion to dismiss under Rule 12(b)(6), the court must construe the complaint in the light most favorable to the plaintiff and accept all well-pleaded facts as true. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009). The court may also consider "exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim." *Lum v. Bank of Am.*, 361 F.3d 217, 222 n.3 (3d Cir. 2004); *see also* Fed. R. Civ. P. 10(c). Any "[t]hreadbare recitals of the elements of a cause of action, legal conclusions, and conclusory statements" may be disregarded. *City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp.*, 908 F.3d 872, 879 (3d Cir. 2018) (internal citation omitted).

4

To survive a Rule 12(b)(6) challenge, the plaintiff must plead facts sufficient to state a claim for relief that is "plausible on its face." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Therefore, the operative complaint must contain sufficient facts to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). The operative complaint must do more than merely allege the plaintiff's entitlement to relief; it must "show such an entitlement with its facts." *Fowler*, 578 F.3d at 211 (citations omitted).

**DISCUSSION**

As noted, T. Rowe Price moves to dismiss each of the three claims asserted against them. As to Plaintiffs' Federal Arbitration Act claim, T. Rowe Price argues that it should be dismissed because Plaintiffs cannot invoke any written arbitration agreement or statute to compel T. Rowe Price to arbitrate. T. Rowe Price further argues that Plaintiffs' claims under the SEA and the UTPCPL must be dismissed for lack of standing. This Court will address each of these arguments in turn.[5]

---

[5]    In their supplemental brief, T. Rowe Price argues that this Court should also dismiss Plaintiffs' claims under the SEA and the UTPCPL under the doctrine of non-mutual collateral estoppel (issue preclusion). Specifically, T. Rowe Price contends that Plaintiffs should be precluded from pursuing claims premised on the allegation that T. Rowe Price "helped Dosik conceal" his purported mismanagement of the IRA because the Orphans' Court already decided that Plaintiffs lack standing to sue Dosik in his individual capacity. (*See* T. Rowe Price's Suppl. Br., ECF 76, at p. 4). Collateral estoppel requires a previous determination that "(1) the identical issue was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was necessary to the decision; and (4) the party being precluded from re-litigating the issue was fully represented in the prior action." *Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 249 (3d Cir. 2006) (citation omitted); *see also Walzer v. Muriel, Siebert & Co., Inc.*, 221 F. App'x 153, 155 (3d Cir. 2007) (explaining that collateral estoppel, although an affirmative defense, may be raised in a Rule 12(b)(6) motion to dismiss).

Here, it is unclear the precise grounds on which the lower courts decided that Plaintiffs lacked standing to sue Dosik. Notably, T. Rowe Price has not provided this Court with all the documents that would be necessary to determine whether the issues raised here were "necessary to the decision" of the lower court, especially given the differing standing requirements for the claims alleged here and before the

### *Claim to Compel Arbitration (Count I)*

As grounds to dismiss Plaintiffs' claim to compel arbitration, T. Rowe Price argues that under FINRA Rule 12200, Plaintiffs were not and are not T. Rowe Price's "customers" with respect to Rhea Needle's IRA. Further, T. Rowe Price argues that no written arbitration agreement exists between Plaintiffs and T. Rowe Price that would compel arbitration. In their response, Plaintiffs incorporate their previous arguments in opposition to T. Rowe Price's motion for a preliminary injunction, *to wit*: that they may enforce arbitration (1) under FINRA Rule 12200 as T. Rowe Price's "customers" and (2) pursuant to the New Account Form, as the assignees of Rhea Needle's rights and/or as third-party beneficiaries of the contract. Neither of Plaintiffs' arguments has merit.

#### *1. FINRA Rule 12200*

FINRA is an independent, government-authorized regulator of securities firms and brokerages in the United States.[6] FINRA promulgates rules and guidelines that govern its members. Relevant here, FINRA Rule 12200 requires a FINRA member, such as T. Rowe Price,[7] to arbitrate certain claims brought against it by a "customer." *Reading Health Sys.*, 900 F.3d at 90. Specifically, the Rule requires a member to arbitrate a dispute if (1) arbitration is "[r]equested

---

Orphans' Court. Nonetheless, as discussed below, Plaintiffs' claims against T. Rowe Price fail for other reasons. As such, this Court need not resolve T. Rowe Price's collateral estoppel argument.

T. Rowe Price also argues that all claims against them were waived by Rhea Needle through the Power of Attorney, which included an "indemnification, hold-harmless, and ratification provision." (T. Rowe Price's Br., ECF 32, at p. 5). Because this Court finds that Plaintiffs lack standing for all of their claims against T. Rowe Price, it need not address the issue of waiver under the Power of Attorney.

[6]     *About FINRA*, FINRA, https://www.finra.org/about (last visited July 19, 2022).

[7]     Only T. Rowe Price Investment Services, Inc., is a member of FINRA. However, for purposes of clarity and consistency, this Court will continue to refer to T. Rowe Price, collectively, throughout its analysis.

6

by the customer," (2) "[t]he dispute is between a customer and a member," and (3) "[t]he dispute arises in connection with the business activities of the member."

Plaintiffs argue that they are T. Rowe Price's "customers" because they held beneficiary accounts set up by T. Rowe Price to effectuate the transfer of funds from the IRA to Plaintiffs. In support, Plaintiffs cite to *Stagliano v. O.N. Equity Sales Co.*, wherein a court in this district defined "customer" as "one who either (1) purchases a good or service from a FINRA member; or (2) has an account with a FINRA member." 2020 WL 3172891, at *4 (E.D. Pa. June 15, 2020) (citing *Citigroup Glob. Mkts. Inc. v. Abbar*, 761 F.3d 268, 276 (2d Cir. 2014)).

Importantly, the third component of Rule 12200 requires arbitration *only* where the dispute arises "in connection with the business activities of the member." Courts have interpreted this third requirement of Rule 12200 as only requiring arbitration of disputes "arising from the account" of the customer. *See, e.g.*, *Citigroup Glob. Mkts.*, 761 F.3d at 275. Regardless of whether Plaintiffs would be considered customers for another purpose, the dispute Plaintiffs presently seek to arbitrate against T. Rowe Price does not concern their own personal or beneficiary accounts. Rather, Plaintiffs seek to compel the arbitration of disputes that allegedly arose from the management of their *mother's* IRA. As T. Rowe Price argues, allowing a perceived customer to invoke Rule 12200 to arbitrate disputes arising from *any* customer's account would have "no apparent limiting principle." (T. Rowe Price's Br., ECF 32, at p. 18). This Court agrees and, accordingly, finds that Plaintiffs cannot invoke Rule 12200 to compel T. Rowe Price to arbitrate Plaintiffs' specific claims.

### 2. Written Arbitration Agreement

Plaintiffs next argue that they may compel T. Rowe Price to arbitrate Plaintiffs' claims under the Arbitration Clause in Rhea Needle's IRA New Account Form as third-party beneficiaries

or, alternatively, as assignees of Rhea Needle's rights following her death.  Plaintiffs are mistaken.

The Arbitration Clause provides, in relevant part, that the account holder—Rhea Needle—"agrees to settle by arbitration any controversy between [herself] and [T. Rowe] Price."  (New Account Form, ECF 32, at p. 67).  It is undisputed that Plaintiffs are not the parties to the underlying contract between T. Rowe Price and Rhea Needle that contains the Arbitration Clause.

Nonetheless, under certain circumstances, nonparties to an agreement to arbitrate may bind a signatory party "when traditional principles of state law allow a contract to be enforced by or against nonparties[.]"  *Kipp v. Weyerhauser Co.*, 354 F. Supp. 3d 622, 626 (E.D. Pa. 2018) (citing *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009)) (other citations, quotation marks, and alterations omitted).  Such traditional principles may include, *inter alia*, third-party beneficiary and assignment.  Plaintiffs contend that they are the "intended beneficiaries" of T. Rowe Price's agreement with Rhea Needle and, therefore, they can bind T. Rowe Price to arbitrate their claims. In general, a party cannot be required to submit to the arbitration of a dispute that the party has not agreed to arbitrate.  *See Dougherty v. VFG, LLC*, 118 F. Supp. 3d 699, 711 (E.D. Pa. 2015) (citing *AT & T Tech. v. Commc'n Workers of Am.*, 475 U.S. 643, 648 (1986).  "[C]ourts have been willing to apply third party beneficiary law in examining the contractual standing of a non-signatory party to a dispute, provided there is an expression of the requisite intent between the third party and the plaintiff to arbitrate their claims."  *In re Prudential Ins. Co. of Am. Sales Prac. Litig. All Agent Actions*, 133 F.3d 225, 229 (3d Cir. 1998) (citations omitted).  Here, there is no such expression of the requisite intent between Plaintiffs and T. Rowe Price.  To the contrary, the Arbitration Clause Plaintiffs rely on only provides that Rhea Needle agreed to arbitrate "any controversy **between [herself] and [T. Rowe] Price**."  (New Account Form, ECF 32, at p. 67) (emphasis added). The Arbitration Clause provides no expression of intent to arbitrate that could extend to claims

between Plaintiffs and T. Rowe Price.  Absent any such expression of intent to arbitrate, Plaintiffs' reliance on the Arbitration Clause is unfounded.

Plaintiffs also argue that they can invoke the Arbitration Clause as the assignees of Rhea Needle's rights under her contract with T. Rowe Price.  Specifically, Plaintiffs contend that upon Rhea Needle's death, her rights under the New Account Form passed to her named beneficiaries of the IRA—Plaintiffs and their sister—pursuant to the Uniform Transfer on Death Security Registration Act ("UTDSRA"), an Act adopted in Pennsylvania.  20 Pa. Cons. Stat. §§ 6401–13. Plaintiffs are again mistaken.

In its relevant part, the UTDSRA provides:  "On death of a sole owner or the last to die of all multiple owners, ownership of securities registered in beneficiary form passes to the beneficiary or beneficiaries who survive all owners."  20 Pa. Cons. Stat. § 6407.  It is clear from the plain language of the UTDSRA that the statute concerns the transfer of the actual securities from an original owner to a named beneficiary upon the owner's death, not the transfer of rights under the underlying contract.  *See id.* § 6407 ("On death of a sole owner . . . , ownership ***of securities*** registered in beneficiary form passes to the beneficiary or beneficiaries who survive all owners.") (emphasis added).  As such, under the UTDSRA, upon Rhea Needle's death, Plaintiffs, as two of the named beneficiaries, became the owners of their apportioned *securities* held in the IRA; they did not become owners of, or the "assignees" to, any contractual rights and obligations associated with the IRA.

Because Plaintiffs cannot invoke FINRA Rule 12200 or any written arbitration agreement to compel arbitration of their dispute against T. Rowe Price, their claims are not arbitrable.  Thus, Plaintiffs' claim against T. Rowe Price under the Federal Arbitration Act at Count I is dismissed.

*Violation of the Securities Exchange Act ("SEA")(Count III)*

With regard to Plaintiffs' SEA claim, T. Rowe Price argues that Plaintiffs lack standing because they are neither the "purchasers" nor "sellers" of securities held in Rhea Needle's IRA account within the meaning of the statute.[8]  In response, Plaintiffs argue that they should be considered "sellers" by virtue of the sales of the securities they received through the IRA distributions.

For a plausible claim under Section 10(b) of the SEA, a plaintiff must allege that the defendant used "manipulative or deceptive" practices in contravention of an SEC Rule "in connection with the purchase or sale" of securities.  *See* 15 U.S.C. § 78j(b).  Under SEC Rule 10b-5, it is unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 167 (3d Cir. 2014) (quoting 17 C.F.R. § 240.10b-5(b)).  Only "*purchasers* and *sellers* of securities" may bring claims for securities fraud under Section 10(b) and Rule 10b-5.  *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 731–32 (1975) (citations omitted) (emphasis added).  While the SEA does not expressly define the terms "purchaser" or "seller," it does provide that a "purchase" includes "any contract to buy, purchase or otherwise acquire," 15 U.S.C. § 78c(a)(13), and a "sale" includes "any contract to sell or otherwise dispose of," *id.* § 78c(a)(14).  Courts may look to dictionary definitions to determine the ordinary meaning of a word with reference to its statutory text. *Bonkowski v Oberg Indus. Inc.*, 787 F.3d 190, 200 (3d Cir 2015).  Black's Law Dictionary defines

---

[8]        In his motion to dismiss, Dosik argued that the SEA claim against him was time-barred by the applicable two-year statute of limitations.  T. Rowe Price joined Dosik's motion on statute of limitations grounds, noting that Plaintiffs' similar claim against them is premised on the same factual allegations as that against Dosik.  [ECF 40].  Because this Court finds that Plaintiffs lack standing to sue T. Rowe Price under the SEA, it need not resolve the statute of limitations issue.

"purchaser" as "[s]omeone who obtains property for money or other valuable consideration" or "a buyer." *Purchaser*, Black's Law Dictionary (11th ed. 2019). "Seller" is defined generally as "a person who sells anything." *Seller*, Black's Law Dictionary (11th ed. 2019).

Notwithstanding the fact that the securities that Plaintiffs received as the beneficiaries of the IRA were sold for distribution to the beneficiaries, Plaintiffs have not alleged any facts to support the requisite causal connection between the misconduct alleged with respect to the IRA and any alleged loss to Plaintiffs arising from the sale of the securities they received as beneficiaries. As noted, to assert a claim under Section 10(b) of the SEA, a plaintiff must allege facts to support the alleged unlawful practice "*in connection with* the purchase or sale of [the] security . . . ." 15 U.S.C. § 78j(b) (emphasis added). Here, Plaintiffs' claims are premised on an alleged fraud with respect to the securities in Rhea Needle's IRA. Specifically, Plaintiffs allege that T. Rowe Price failed to provide certain account statements to Rhea Needle, which they were allegedly required to do under FINRA Rule 2231, and instead sent them only to Dosik. Notably, Plaintiffs make no allegations with respect to any unlawful conduct by T. Rowe Price "in connection with" the actual sale or conversion of the securities from *Plaintiffs'* beneficiary accounts. In the absence of such allegations, Plaintiffs' Section 10(b) claim for violation of SEC Rule 10b-5 fails as a matter of law. *See Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., Inc.*, 332 F.R.D. 556, 577 (M.D. Tenn. 2019) ("Rule 10b-5 prohibits misstatements *in connection with* the purchase or sale of any security.") (emphasis added).

Nonetheless, in support of their argument that they are sellers of securities for SEA purposes, Plaintiffs rely on *McFeeley v. Florig*, 966 F. Supp. 378 (E.D. Pa. 1997). Plaintiffs' reliance is misplaced. In *McFeeley*, five sisters, who received securities as a gift from their father, sued their brother for fraud related to the securities. *Id.* The *McFeeley* court noted that "[h]olders

of securities received as gifts are neither sellers nor purchasers" for Section 10(b) purposes. *Id.* at 382. However, the sisters qualified as "sellers" because they were contractually obligated to sell their shares of the securities to their brother, and once that sale took place, they became "sellers." *Id.*; *accord Blue Chip Stamps*, 421 U.S. 751 ("[T]he holders of puts, calls, options, and other contractual rights or duties to purchase or sell securities have been recognized as 'purchasers' or 'sellers' of securities for purposes of Rule 10b-5 . . . because the definitional provisions of the 1934 Act themselves grant them such a status."). Here, by contrast, there is no indication, in the amended complaint or elsewhere, that Plaintiffs were *contractually obligated* to sell the securities they received upon Rhea Needle's death. To the contrary, Plaintiffs received, as a "gift" by reason of their status as beneficiaries, the proceeds of the IRA. Thus, *McFeeley* does not support their argument that they are "sellers."

Plaintiffs also argue that they have standing, derived from their mother's rights under Section 10(b)—rights they argue were assigned to them under the UTDSRA. This Court found earlier in this Opinion that Plaintiffs could not bind T. Rowe Price to arbitration by virtue of their purported status as assignees of their mother's contractual rights under the New Account Form. For the same reasons, Plaintiffs lack standing to sue T. Rowe Price under the SEA under an assignment theory.

For the reasons offered, this Court finds that Plaintiffs are not "purchasers" or "sellers" under Section 10(b) of the SEA and Rule 10b-5 with respect to the securities held in Rhea Needle's IRA account. Therefore, Plaintiffs lack standing for an SEA claim against T. Rowe Price, and the claim against them at Count III is dismissed.

### *Violation of the UTPCPL (Count V)*

As to the UTPCPL claim, T. Rowe Price argues, *inter alia*, that the claim must be dismissed for lack of standing again because Plaintiffs are not "purchasers" of goods or services from T. Rowe Price.  As with Plaintiffs' SEA claim, this Court agrees with T. Rowe Price.

The UTPCPL provides a private right of action to a person who "purchases or leases goods or services" and "suffers any ascertainable loss of money or property," 73 Pa. Cons. Stat. § 201-9.2, as a result of unlawful "unfair or deceptive acts or practices" as defined by the statute, *id.* § 201-3.[9]  The UTPCPL does not expressly define "purchaser" or "lessor."  However, the United States Court of Appeals for the Third Circuit (the "Third Circuit") has held that "those who may receive a benefit from the purchase" are distinct from "purchasers" and "lessors" and, thus, are not protected under the statute.  *Gemini Physical Therapy & Rehab., Inc. v. State Farm Mut. Auto. Ins. Co.*, 40 F.3d 63, 65 (3d Cir. 1994); *see also Zerpol Corp. v. DMP Corp.*, 561 F. Supp. 404, 415 (E.D. Pa. 1983) ("[A] private cause of action under the [UTPCPL] is available only to purchasers or lessors of goods . . . .") (citing 73 Pa. Cons. Stat. § 201-9.2).

Based on the allegations in the amended complaint, Plaintiffs received the benefit of Rhea Needle's contributions to the IRA.  Therefore, Plaintiffs are neither purchasers nor lessors under the Third Circuit's definitions.  Clearly, Plaintiff never purchased any goods or services from T. Rowe Price in connection with their mother's IRA.  Thus, as named beneficiaries of the IRA, they received a benefit from T. Rowe Price's actions related to the account.  *See Gemini Physical Therapy & Rehab.*, 40 F.3d at 65.  As such, Plaintiffs do not fall within the class of individuals protected under the UTPCPL.  *See Branche v. Wells Fargo Home Mortg., Inc.*, 624 F. App'x 61, 64 (3d Cir. 2015).  Notably, in *Branche*, the Third Circuit concluded that the plaintiff, whose late

---

[9]    "Unfair or deceptive acts or practices" is defined as one or more actions in a comprehensive list provided at 73 Pa. Cons. Stat. § 201-2(4).

husband had obtained a mortgage from a bank, did not have standing to sue the bank under the UTPCPL in her individual capacity, while noting that the husband's estate may have had a claim. *Id.* In their brief in opposition, Plaintiffs attempt to distinguish *Branche* from this case. However, as in *Branche*, Plaintiffs' claims against T. Rowe Price were brought only in their individual capacities, not on behalf of Rhea Needle's estate. Thus, the cases are comparable.

Plaintiffs also argue that they have standing for their UTPCPL claim because (1) they are the intended third-party beneficiaries of the New Account Form and the Power of Attorney and (1) they are the assignees of Rhea Needle's rights under the New Account Form. Plaintiffs are mistaken. As previously noted, this Court found that Plaintiffs cannot invoke the arbitration clause in the New Account Form by virtue of their status as assignees—or third-party beneficiaries—of Rhea Needle's rights upon her death. Likewise, Plaintiffs fare no better in their arguments in support of their UTPCPL claim.

To support their third-party intended beneficiary argument, Plaintiffs rely on *Guy v. Liederbach*, 459 A.2d 744 (Pa. 1983). In *Guy*, the Supreme Court of Pennsylvania held that a legatee could sue a testator's lawyer for malpractice in drafting a will, as the legatee was the intended beneficiary of the contract between the testator and the lawyer. *Id.* at 751–52. *Guy*, however, involved common-law malpractice claims, not the UTPCPL. Thus, the case is inapposite here. The UTPCPL does not allow those who merely *benefit* from a transaction to sue under the statute; only "purchasers" or "lessors" may bring such a claim. *Gemini Physical Therapy & Rehab.*, 40 F.3d at 65. Because Plaintiffs are neither purchasers nor lessors under the UTPCPL, they do not have standing for their UTPCPL claim as third-party beneficiaries of the IRA.

Plaintiffs' assignment argument also lacks merit. Notably, their attempt to distinguish this matter from *Gemini* is unavailing. There, contrary to Plaintiffs' contention, the Third Circuit

concluded that UTPCPL claims are *not* assignable, based on the statute's narrow purpose of protecting consumers of goods and services. *See id.* at 66. Regardless, this Court has determined that Plaintiffs were not assigned any of their mother's contractual rights by virtue of their status as IRA beneficiaries. As noted above, the UTDSRA does not provide for the transfer of Rhea Needle's legal rights under the IRA to her named beneficiaries, but rather the transfer of the securities held in the account themselves. *See* 20 Pa. Cons. Stat. § 6407. Therefore, Plaintiffs do not have standing for their UTPCPL claim based on assignment.

Because Plaintiffs are not "purchasers" or "lessors" of goods or services, nor are they third-party beneficiaries or assignees, they do not have standing for their UTPCPL claim against T. Rowe Price. Therefore, Plaintiffs' claim against T. Rowe Price at Count V is dismissed.

**CONCLUSION**

For the foregoing reasons, T. Rowe Price's motion to dismiss is granted. Accordingly, all of Plaintiffs' claims against Defendants T. Rowe Price Group, Inc., T. Rowe Price Associates, Inc., and T. Rowe Price Investment Services, Inc., (Counts I, III, and V) are dismissed. An Order consistent with this Memorandum Opinion follows.

*NITZA I. QUIÑONES ALEJANDRO*, J.

15

# EXHIBIT D

**FOURTH REVISED STATEMENT OF CLAIM- FINRA-DR Arbitration #2022-00367**
(Signed FINRA Arbitration Submission Agreement / Claim Information Sheet Attached)

1.  Claimant, William A. Needle, makes the claims set forth herein as co-Administrator of the Estate of Rhea Needle (4080 of 2018; 322 DE 2019, O.C. Phila.) or, alternately, as a (A) a registered beneficiary, assignee, and successor in interest (within the meaning of 20 PA.C.S. §5601.3) of an IRA opened for Rhea S. Needle at T. Rowe Price Investment Services, Inc. on 1/1102 (See ¶14 below) AND (B) owner of a "beneficiary account" at T. Rowe Price Investment Ser-vices, Inc. established on or about March 7, 2019 to receive and sell his share of the IRA. See ¶69 below.

2.  Claimant, Michael R. Needle, makes the claims set forth herein as co-Administrator of the Estate of Rhea Needle or, alternately, as a (A) a registered beneficiary, assignee, and successor in interest (within the meaning of 20 PA.C.S. §5601.3) of an IRA opened for Rhea S. Needle at T. Rowe Price Investment Services, Inc. on 1/11/02 (See ¶14 below) AND (B) owner of a "beneficiary account" at T. Rowe Price Investment Services, Inc. established on or about March 7, 2019 to receive and sell his share of the IRA. See ¶69 below.

3.  Respondent, T. Rowe Price Investment Services, Inc. is a Maryland corporation, a wholly-owned subsidiary of T. Rowe Price Associates, Inc., and a member of the Financial Industry Regulatory Authority ("FINRA").

4.  Respondent T. Rowe Price Associates, Inc. is a Maryland corporation, a wholly-owed subsidiary of T. Rowe Price Group and an advisor member of FINRA.

5.  Respondent T. Rowe Price Group, Inc. is a Maryland corporation. Respondents are hereinafter collectively referred to as "TRP."

6. Claimants and Susan Dosik (5/9/56-8/24/21) are the children of Lawrence I. Needle (5/22/25-12/8/01) and Rhea S. Needle (10/17/28-9/18/18).  Susan Dosik resided with her husband, Edward Dosik ("Dosik") at 11221 Korman Drive, Potomac MD 20854.  At all times relevant hereto, Dosik was a licensed certified public accountant ("CPA) who also purported to be an experienced and skilled investor.

7.  Before Lawrence I. Needle's death on 12/8/01, Lawrence and Rhea Needle managed and invested their savings with advice and assistance from professionals at Citizens Bank (Jenkintown branch). On October 23, 1998, Rhea Needle appointed Michael R. Needle as her Agent under a General and Durable power of attorney.  Exhibit 1. This was re-executed on October 10, 2017 and recorded with the Philadelphia Recorder of Deeds (Doc Id. 53304032).

8.  After Lawrence Needle's death, Rhea Needle owned 1173 Dixon Lane, Rydal PA (residence) and 5200 Boardwalk, Unit 11E, Ventnor NJ.  She was also heir to Unit 16A7, 2401 Pennsylvania Avenue, Philadelphia, PA, a condominium belonging to Bertha F. Needle (Lawrence Needle's maternal aunt).  She had approximately $200,000 in savings, including three IRAs.  She received her husband's social security benefits (the maximum).

9.  From Lawrence I. Needle's death through her own, Rhea Needle's estate plan was to use her savings and the proceeds of any sale of real estate to generate supplemental income (in addition to SSI and IRA income), to support her modest life style in retirement and leave the principal to her children.

**Rhea Needle's TRP Accounts**

10.    On or about 12/15/01, Rhea Needle signed a "Brokerage – New Account Form" for an IRA  and named Plaintiffs as beneficiaries. Exhibit 2A.  It was otherwise completed in handwriting other than hers and gave the owner's name and address as:

> Rhea S Needle
> 1173 Dixon Lane
> Rydal, PA 19046

11.    Around Christmas 2001, Susan Dosik and her husband, Edward Dosik, traveled from Maryland to Rydal PA to pressure Rhea Needle to put her savings under  Dosik's management.  Dosik represented to Rhea Needle (and William A. Needle, who was living with her in December 2001) that he "was qualified and competent to manage her savings by virtue of his accounting background and experience in such matters, as well as his probity as a certified public accountant." Exhibit 10, p. 2. This was false: he had virtually no such experience, as he testified in court on 11/3/21.  Exhibit 22, pp. 73-74.

12.    On 12/26/01,  Rhea Needle, in reliance on Dosik's representations and at his request, signed a TRP form power of attorney ("POA"). Exhibit 2B. This appointed Dosik as agent "to buy sell ... and trade in stocks, bonds, options, mutual funds and any other securities" in TRP accounts to be opened for her. Dosik had a relationship with TRP which he did not disclose to Rhea Needle and concealed from her and Claimants (and is still hiding from them).

13.    Dosik, by undertaking to act under the TRP POA, took on a duty to manage Rhea Needle's savings "with the care, competence and diligence ordinarily exercised by Agents in similar circumstances," 20 Pa.C.S. §5601.3(b), and with the "special skills or expertise" Dosik purported to have. 20 Pa.C.S. §5601.3(b) .  He thus promised to invest Rhea Needle's savings in accordance with the prudent man standard. Exhibit 10, p. 5; Exhibit 22, pp. 147-48. He did not know or understand this standard, as he admitted in court on 11/3/21. Exhibit 22, pp. 147-148.

14.    On January 11, 2002, Dosik opened two TRP brokerage accounts for Rhea Needle aka Investor 994804080 (Exhibit 10, pp.  2, 11):

- "IRA FBO Rhea S Needle Trp Trust co Custodian Rollover Account Edward Dosik Trp/Poa" ("the IRA"), naming Claimants and Susan Dosik as registered beneficiaries, and into which an existing IRA worth $61,154.81 was transferred on 1/16/02

- "Edward B Dosik, Agent TRP/POA Dtd12/26/2001 Rhea S Needle," ("the Taxable Account"), into which $2,500 was deposited on 1/16/02.

15.    TRP required Dosik to execute TRP IRA brokerage and regular brokerage agreements in order to trade in these accounts.  Dosik presumably did so on or about 1/11/02.

16.    TRP did not furnish Rhea Needle with copies of agreements executed by Dosik as her agent.  This failure violated SEC Rule 17a-3, 17 C.F.R. 240.17(a)-3(17(iii), which requires "for each account with a natural person as a customer or owner," that TRP have a record "indicating that each customer or owner was furnished with a copy of each written agreement * * * pertaining to that account    * * *." Dosik also refused to supply copies of these agreements to Claimants in violation of 20 Pa.C.S. §5601.3(b) and (d).

17.    The "Brokerage – New Account Form" supposedly signed by Rhea Needle on 12/15/01 (Exhibit 2A) provided for arbitration of any disputes with any of the Respondents:

I agree to settle by arbitration any controversy between myself and Price, its parent, or affiliates, * * * relating to the Account Agreements. my account, or account transactions, or in any way arising from my brokerage relationship with Price as provided in the * * * Brokerage Handbook.[1]

18.    From January 11, 2002 through Rhea Needle's death on September 18, 2018, TRP never sent an account statement to Rhea Needle (or Michael Needle as her Agent under General and Durable Power of Attorney), in violation of its FINRA Rule 2231 obligation to:

with a frequency of not less than once every calendar quarter, send a statement of account* * * * containing a description of any securities positions, money balances, or account activity to each customer whose account had a security position, money balance, or account activity during the period since the last such statement was sent

19.    From 2002 through 2013, TRP mailed account statements solely to Dosik as follows (see Exhibit 25, Attachments 2 & 3):

| Period | Customer Statement | Agent Statement |
|---|---|---|
| 2002-2005 | Edward Dosik Trp/ Poa Dtd 12/26/01 T Rowe Price Trust Co Cust For The IRA Of Rhea S Needle 1173 Dixon Lane Rydal PA 19046-1828 | Edward B Dosik 11221 Korman Dr Potomac MD 20854-2049 |
| 2006-2013 | Edward Dosik Trp/ Poa Dtd 12/26/01 T Rowe Price Trust Co Cust For The IRA Of Rhea S Needle 2401 Pennsylvania  Apt 16A7 Philadelphia PA19130-3051 | Edward B Dosik 11221 Korman Dr Potomac MD 20854-2049 |

21.    In or about March or April 2014, TRP began mailing one statement only, to Dosik at his address as follows, and did so through Rhea Needle's death (see Exhibit 25, Attachment 2):

Edward Dosik Trp/ Poa
Dtd 12/26/01 T Rowe Price
Trust Co Cust For The
IRA Of Rhea S Needle
11221 Korman Dr
Potomac MD 20854-2049

22.    TRP did not send agreements or statements to Rhea Needle at Dosik's request and by agreement with him on 1/11/02 (when the accounts were opened) and in or about April 2014. with the purpose and effect of facilitating Dosik's fraud on Rhea Needle and Claimants alleged herein.

---

[1] TRP is bound by FINRA Rule 12000 *et seq* notwithstanding anything to the contrary in Exhibit 2A. FINRA Rule 2268(d)("No predispute arbitration agreement shall include any condition that: (1) limits or contradicts the rules of any self-regulatory organization; (2) limits the ability of a party to file any claim in arbitration * * * (4) limits the ability of arbitrators to make any award.)

## Mismanagement/Fraud: January 2002-August 2006

23.    On January 25, 2002, $100,000 was deposited in the Taxable Account.  This and the $61,154.81 IRA transfer on 1/16/02, was substantially all of Rhea Needle's savings other than two small IRA's. Claimants learned of this $100,000 transfer after receiving and reviewing a court-ordered Accounting by Dosik filed on October 30, 2019 in No. 322-PR-2019 in the Orphans Court Division of the Court of Common Pleas of Philadelphia County, PA. Exhibit 16.

24.    Given Rhea Needle's age, estate plan, and modest life style, prudence dictated investing 2/3's of her savings in income generating securities and 1/3 in equities and doing so using professionally managed funds in order to diversify.  Exhibits 21, 27 (Paul Irwin Report)

25.    Instead, Dosik used the $61,154.81 IRA transfer and $102,500 deposited in the Taxable Account to purchase (A) odd lots of high interest bonds at large, undisclosed markups by TRP and (B) financial and real estate stocks at real estate bubble prices. See Exhibits 13, 14, 16, 17 (10/30/19 Accounting, compilations therefrom) and 21(Paul Irwin Report).

26.    On February 21, 2002, Dosik executed a TRP Form IRA Distribution Request. Exhibit 3.  TRP did not furnish a copy to Rhea Needle in violation of SEC Rule 17a-3, 17 C.F.R. 240.17(a)-3(17(iii).  Dosik used this document to divert IRA distributions from Rhea Needle to the Taxable Account.  TRP did not supply this form to Rhea Needle.  Claimants first learned of this diversion from their review of Dosik's Accounting of the Taxable Account filed on 10/30/19. Exhibit 16.

27.    On May 15, 2002, Rhea Needle sold 5200 Boardwalk, Unit 11E.  At her request, $137,696.35 in net proceeds was paid to her for investment through Citizens Bank.

28    Thereafter, Dosik and Susan Dosik pressured Rhea Needle to transfer these proceeds and two IRAs to the TRP accounts, as follows:

| Date | Description | Amount | To: |
|---|---|---|---|
| 20020518 | Ventnor Condo proceeds | $550.00 | Taxable |
| 20020701 | Ventnor Condo proceeds | $75,000.00 | Taxable |
| 20020819 | IRA rollover | $2,544.88 | IRA |
| 20030912 | IRA rollover Transamerica | $27,283.78 | IRA |
| 20030919 | Federated Equity Income Fund, Class B* | $2,822.65 | Taxable |
| 20030919 | Federated Strategic Income Fund, Class B* | $33,026.83 | Taxable |
| 20030919 | Federated Bond Fund, Class B* | $9,382.94 | Taxable |
| 20030919 | Checking, Citizens Investment Serv. Corp.* | $210.24 | Taxable |

*Purchased through Citizens Bank with net proceeds of Ventnor condominium sale

29.    Claimants first learned of these transfers from their review of Dosik's Accounting of the IRA and Taxable Account filed on 10/30/19.  Exhibits 13, 16.

30.     Rhea Needle thus transferred $90,983.47 to the TRP IRA account in 2002 and 2003.  Dosik's Accounting of the IRA on 10/30/19 (Exhibit 13) shows that he used $56,765 74 to purchase odd lots of bonds and preferred stock with high nominal yields from TRP, but at high markups (prices well above par) resulting in losses on disposition and an actual yield well below the coupon rate, and $28,245.83 to buy financial and real estate stocks (over half lost when the real estate bubble burst), as follows:

| | Bought: | Price | Financial | R/E | Other | Gain/Loss |
|---|---|---|---|---|---|---|
| Maytag Corp. 7.85% Notes | 20020207 | $10,272.54 | | | X | ($272.54) |
| Maytag Corp. 7.85% Notes | 20020815 | $5,055.00 | | | X | ($55.00) |
| Merrill Lynch 7.75% Pfd.Ser. B | 20020905 | $13,105.00 | X | | | ($605.00) |
| St. Paul Cap. 7.60% Pfd. Ser. A | 20031202 | $13,409.95 | X | | | ($909.95) |
| Fleet Cap. 7.20% Pfd. Ser. M | 20031202 | $10,679.23 | X | | | ($2,081.35) |
| **Total** | | **$56,765.64** | **73.00%** | **0.0%** | **27.00%** | **($4,519.96)** |
| Weingarten Realty Inc. | 20020208 | $16,516.16 | | X | | ($8,034.12) |
| Citigroup | 20020815 | $7,104.07 | X | | | ($3,904.00) |
| Travelers Prop.&Cas. Cl. A | 20020826 | $0.00 | X | | | 113.84 |
| Travelers Prop.&Cas. Cl. B | 20020826 | $0.00 | X | | | 240.76 |
| Citigroup | 20020906 | $4,625.60 | X | | | ($2,541.98) |
| **Total** | | **$28,245.83** | **41.53%** | **58.47%** | **0.00%** | **($14,125.50)** |

31.     Dosik's Accounting of the Taxable Account on 10/30/19 (Exhibit 16) also shows that Rhea Needle was induced to invest $223,992.66 in the Taxable Account in 2002 and 2003 and an additional $6,377.29 in 2004 and 2005; that Dosik used this to: (A) purchase 27 odd lots of bonds and preferred stock with high nominal yields from TRP, but at high markups (prices well above par), resulting in losses on disposition and an actual yield well below the coupon rate, (B) to buy financial and real estate stocks (over half lost when the real estate bubble burst), and (C) engage in market timing via purchases and sales of the TRP Equity 500 Index Fund, as follows:

| | Purchases | Financial | R/E | Other | Gain/Loss |
|---|---|---|---|---|---|
| Bonds/PFD stock (27) | $353,817.32 | $201,259.37 | $10,551.95 | $132,011.69 | **($11,280.42)** |
| | 100.00% | 56.88% | 2.98% | 37.31% | |
| Common Stock (2) | $17,922.50 | $7,607.50 | $10,315.00 | $0.00 | **$3,029.07** |
| | 100.00% | 42.45% | 57.55% | 0.00% | |
| TRP Equity 500 Index Fund | $111,851.51 | | | | **($24,351.51)** |

32.     TRP and Dosik concealed the high risks and low yields of Dosik's "investment strategy" (so-called by Dosik) by not sending account statements to Rhea Needle.  Claimants did not learn of any of this until receiving and reviewing Dosik's Accounting of the IRA and Taxable Account filed on 10/30/19.  Exhibits 13, 16.

33.    On November 23, 2005, Bertha F. Needle died.  Her Will left 16A7 2401Pennsylvania Ave. and other assets to Rhea Needle and appointed Michael Needle as Executor.  Her other assets had dwindled to an amount insufficient to fund renovations needed by Unit 16A7, in which she had lived for over three decades without renovation.

34.    To preserve her estate plan, Rhea Needle asked Michael Needle to renovate Unit16A7 as a retirement residence in order to minimize the use of sale proceeds of 1173 Dixon Lane to renovate Unit 16A7 to maximize the amount left to invest for supplemental retirement income.

35.    From February through August 2006, Michael Needle renovated Unit 16A7 at a cost leaving all but $55,947.40 of the 1173 sale proceeds to generate supplemental  retirement income.  [Due to disputes with a creditor and regarding taxes, the precise amount would not be known until an Accounting and Adjudication in the Estate of Bertha F. Needle in 2008.]

36.    Michael Needle also negotiated and handled a sale of 1173.  Rhea Needle resigned from her part time social worker position in June 2006 and moved to Unit 16A7 later that summer.

37.    On August 22, 2006, the sale of 1173 closed. Net proceeds were $355,235.92, leaving $299,288.52 to invest and generate supplemental retirement income.

38.    That same day, and for days before, Dosik and Susan Dosik urged Michael Needle, as Rhea Needle's Agent, to send the $355,235.92 to the Taxable Account. They falsely represented that prior principal contributions had been conserved by prudent investment and Dosik would do likewise with the 1173 sale proceeds.

39.    In reliance on these representations, Michael Needle as Rhea Needle's Agent under General and Durable Power of Attorney (Exhibit 1) instructed the settlement clerk to wire $355,235.92 to the Taxable Account.

40.    These representations were false as set forth in paragraphs 22 through 30 above. Dosik had in fact, imprudently purchased odd lots of low-rated, high interest bonds at large, markups, used 75% of principal to buy financial and real estate stocks at real estate bubble prices and imprudently failed to diversify, engaged in speculative market timing, and intended to use the $355,235.92 in a similar fashion.

41.    Dosik and TRP concealed all of this by not sending account statements to Rhea Needle.  Dosik and TRP concealed the high risks and low yields of Dosik's "investment strategy" (so-called by Dosik) by not sending account statements to Rhea Needle.  Claimants did not learn of this until receiving and reviewing Dosik's Accounting of the IRA and Taxable Account filed on 10/30/19.  Exhibits 13, 16.

**Mismanagement/Fraud: August 2006 – August 2014**

42.    On September 7, 2008, Michael Needle requested payment of $55,947.40 due from Rhea Needle to the Estate of Bertha F. Needle per an Adjudication confirming Michael Needle's Account as Executor. Dosik assured Michael Needle that the principal invested at TRP had been conserved and $55,947.40 was available to repay the Bertha Needle estate.

43.    This assurance was false. After receiving the 1173 proceeds, Dosik had continued purchase odd lots of bonds and preferred stocks with high nominal interest rates (mostly financial and real estate sectors) from TRP at high markups, resulting in losses on disposition and low actual yields, to buy financial and real estate stocks at prices inflated by the real estate bubble, and engage in speculative market timing in TRP equity funds, as reflected in Exhibits 13 and 16, as follows:

| | Bought: | Price | Fnc'l | R/E | Other | Gain/Loss |
|---|---|---|---|---|---|---|
| Equity Res. 6.48% PFD Ser. N | 20061124 | $12,617.95 | X | | | ($4,293.91) |
| Linc.Nat. Cap. 6.75% PFD Ser. F | 20061124 | $15,456.95 | X | | | ($8,964.90) |
| Wells Fargo Cap. 6.95% PFD Ser O | 20070215 | $11,330.45 | X | | | ($80.45) |
| Wells Fargo Cap. 7.00% PFD Ser F | 20070516 | $11,456.45 | X | | | ($210.84) |
| **Total (IRA):** | | **$50,861.80** | **100%** | | | **($13,550.10)** |
| Capital One  7.125% Sen. Notes | 20060911 | $11,453.71 | X | | | ($366.63) |
| Bankers Trust NY 6.00% Notes | 20060911 | $15,887.00 | X | | | ($222.00) |
| Safeway Inc. 6.50% Notes | 20060911 | $15,672.21 | | | X | ($358.05) |
| Equity Off. Prop.Tr.7.25% PFD Ser G | 20061023 | $12,792.95 | | X | | ($292.95) |
| Merrill Lynch Cap 7.12% Pref Ser E | 20061026 | $14,187.53 | X | | | ($2,061.81) |
| Citigroup Capital 6.95% Pref Ser Z | 20061129 | $25,122.96 | X | | | ($11,454.05) |
| Morgan Stanley Cap 7.25% PFD Ser I | 20061226 | $12,572.95 | X | | | ($72.95) |
| GMAC LLC 7.25% Pref Ser M | 20070305 | $12,037.95 | X | | | ($3,431.04) |
| Caterpillar Fin Corp. 4.35% Notes | 20071121 | $15,270.81 | | | X | ($131.25) |
| Safeco Corp. 4.875% Notes | 20071121 | $25,438.65 | | | X | ($66.25) |
| Pacific Bell 6.625% Notes | 20080102 | $20,975.11 | | | X | ($750.60) |
| FPL Capital Inc. Debentures 5.625% | 20080904 | $15,667.03 | X | | | ($660.00) |
| United Health Group 5.50% Notes | 20080904 | $20,437.86 | X | | | ($84.80) |
| **Total:** | | **$217,516.72** | **58.56%** | **5.88%** | **35.56%** | **($19,952.38)** |
| Bank of America | 20060915 | $13,962.23 | X | | | ($7,404.68) |
| T. Rowe Price | 20060927 | $9,424.59 | X | | | ($5,041.57) |
| Peabody Energy Corp | 20070514 | $10,267.55 | | | X | $8,907.57 |
| Weingarten Realty Inc. Shares | 20070613 | $20,601.04 | | X | | ($12,620.07) |
| Burlington Northern Santa Fe | 20070617 | $8,759.95 | | | X | $1,319.26 |
| Total: | | $63,015.36 | 37.11% | 32.69% | 30.20% | |
| TRP Int'l Stock 500 Mut. Fund | 20060902 | $25,387.78 | | | | **($15,258.50)** |

44.    TRP and Dosik concealed the high risks and low yields of Dosik's "investment strategy" in late 2006, 2007 and 2008 from Rhea Needle (and Michael Needle as her Agent under General and Durable Power of Attorney) by not sending account statements to Rhea Needle. Claimants did not learn of any of this until receiving and reviewing Dosik's Accounting of the IRA and Taxable Account filed on 10/30/19.  Exhibits 13, 16.

45.    On November 7, 2010, Dosik (according to his testimony at a hearing on 11/3/21) met with Rhea Needle in Philadelphia, represented to her that corporate bonds then held in the IRA and Taxable Account were yielding  over 5%, based on par value and coupon yield.  He omitted to state that the true yield was substantially less due to high markups paid to TRP for bonds and consequent losses on disposition.  He also failed to disclose the loss of $92,611.81 (13.7% of principal) on equity investments due to Dosik's imprudent "strategy" of concentrating on banking and real estate stocks and imprudent attempts to time the market in the purchase and sale of equity funds:

|  | Date | Cost | Disposition | Loss |
|---|---|---|---|---|
| Weingarten Realty Inc. Com. (IRA) | 20020208 | $16,516.16 | 2008-09 | ($8,034.12) |
| Citigroup Com. (IRA) | 20020815 | $7,104.07 | 2008 | ($3,904.00) |
| Citigroup Com. (IRA) | 20020906 | $4,625.60 | 2008 | ($2,541.98) |
|  |  |  |  |  |
| Bank of America Com. | 20060915 | $13,962.23 | 2008 | ($7,404.68) |
| T. Rowe Price Com. | 20060927 | $9,424.59 | 2009 | ($5,041.57) |
| Weingarten Realty Inc. Shares | 20070613 | $20,601.04 | 2008 | ($12,620.07) |
|  |  |  |  |  |
| TRP Equity Index 500 Mut. Fund | 20040503 | $82,806.89 | 2009 | ($37,806.89) |
| TRP Int'l Stock 500 Mut. Fund | 20060902 | $25,387.78 | 2009 | ($15,258.50) |

46.    Dosik and TRP concealed the high risks, low yields and large losses in 2008 and 2009 as results of Dosik's "investment strategy" from Rhea Needle by not sending account statements to her. Claimants did not learn any of this until receiving and reviewing Dosik's Accounting of the IRA and Taxable Account filed on 10/30/19.  Exhibits 13, 16.

47.    In 2012 or 2013, Dosik became Rhea Needle's CPA by and after informing her and Michael Needle that her regular accountant (located at 2401 Pennsylvania Avenue) was doing a poor job in preparing Rhea Needle's tax  returns.  In fact, Dosik's purpose in replacing the accountant was to avoid discovery of his mismanagement of her investments by this accountant and to continue his successful concealment of the same.

## Mismanagement/Fraud: August 2014 – September 2018

48.    By August 2014, Rhea Needle, 85, was having difficulty paying expenses (e.g. condominium fee, real estate taxes, insurance premiums and credit card bills). To assist her with this, Dosik became a co-signer on her Wells Fargo checking account.

49.    In or about March or April 2014, Dosik, without authority from Rhea Needle (or Michael Needle as her Agent under General and Durable Power of Attorney), instructed TRP to reroute statements sent to Unit16A7 to his address.  Upon information and belief, this was to prevent Michael Needle, while caring for Rhea Needle at Unit 16A7, from seeing statements sent to Rhea Needle's address but in Dosik's name (or looking at them).

50.    In December 2014, Rhea Needle was diagnosed with vascular dementia, from which she had probably suffered since 2012 at the latest.  Michael Needle had sole authority to make or authorize investment decisions and expenditures for her as her Agent under a General and Durable Power of Attorney.  Exhibit 1.

51.    On or about December 12 and December 30 2014, Dosik and Susan Dosik falsely represented to Plaintiffs that Rhea Needle had been "living on her dividends" and the principal invested at TRP had been conserved.  The Accountings for the IRA and Taxable Account filed by Dosik on 10/31/19 (Exhibits 13 and 16)  revealed that, through 12/31/14, cumulative principal distributions ($402,397.70) greatly exceeded cumulative dividend/interest income ($121,445.32 net of trading losses in generating the income).  See Exhibits 14 and 17 above and paragraphs 55 and 56 below.

52.    On July 13, 2015, Dosik and Susan Dosik visited Unit 16A7 and removed Rhea Needle's financial records (old bank statements and cancelled checks).  See Exhibit 4. Dosik said that he needed these financial records to prepare tax returns.  In fact,  he removed and continued to conceal these records (until October 2024) to prevent Michael Needle, while caring for Rhea Needle at Unit 16A7, from discovering large principal distributions to him or Susan Dosik.

53.    At that time, Dosik and Susan Dosik represented to Claimants that Rhea Needle had been "living on her dividends" and principal had been conserved.  They repeated this on 10/19/15 in Philadelphia and in an email on 2/10/16.  See Exhibit 5, stating:

[W]e * * * invest[ed] the proceeds of her home sale and dad's life insurance like retirement money * * * took advantage of tax breaks etc. and she has been living off the investment income (in addition to social security). She's had a large amount of dividends over the past 10 years which have been paying for entertainment, insurance premiums, food, real estate taxes, Mary's help, visa bill etc.

.    54.    By March 2016, Rhea Needle was no longer able to live at Unit 16A7 and moved into the memory care unit of Watermark at Logan Square. Dosik and Susan Dosik again represented (falsely) to Claimants that Rhea Needle had been "living on her dividends" and principal had been conserved, in an email on 3/16/16 (Exhibit 8) and in Philadelphia on 3/26/16.

55.    These statements were false.  The Accounting of the IRA and Taxable Account filed by Dosik on 10/30/19 (Exhibits 13 & 16) shows principal distributions of $433,747.13 from 2002 through 2015 but net dividend/interest income of $129,084.24, as follows:

| | Dividend/Interest Income | | | | | | Principal Distributions | | |
|---|---|---|---|---|---|---|---|---|---|
| | IRA | IRA Gain/Loss | Taxable | Taxable Gain/Loss | Mut Fund Gain/Loss | Net Income | General | Other | Total |
| 2002 | $2,817.70 | $353.95 | $5,087.43 | ($312.00) | $0.00 | $7,947.08 | | $9,550.00 | $9,550.00 |
| 2003 | $4,410.29 | $0.00 | $11,277.28 | ($1,611.23) | $0.00 | $14,076.34 | | $5,000.00 | $5,000.00 |
| 2004 | $6,327.50 | $0.00 | $11,753.53 | ($898.02) | $0.00 | $17,183.01 | | $19,727.66 | $19,727.66 |
| 2005 | $6,645.60 | $0.00 | $11,375.28 | ($1,446.12) | $0.00 | $16,574.76 | $7,461.00 | $13,117.66 | $20,578.66 |
| 2006 | $7,291.07 | ($1,842.49) | $17,475.93 | ($3,236.41) | $0.00 | $19,688.10 | $6,893.00 | $40,058.83 | $46,951.83 |
| 2007 | $7,012.65 | ($80.45) | $26,829.88 | ($2,645.32) | $0.00 | $31,116.76 | $230.00 | $56,000.00 | $56,230.00 |
| 2008 | $6,411.11 | ($12,041.39) | $18,595.83 | ($13,083.81) | $0.00 | ($118.26) | $40,929.66 | $46,000.00 | $86,929.66 |
| 2009 | $2,847.23 | ($15,697.53) | $10,100.40 | ($15,427.87) | ($53,065.39) | ($71,243.16) | $18,943.00 | $22,000.00 | $40,943.00 |
| 2010 | $3,791.57 | $1,529.95 | $11,519.57 | $2,159.61 | $0.00 | $19,000.70 | | $18,500.00 | $18,500.00 |
| 2011 | $3,715.99 | ($3,215.85) | $12,075.54 | ($1,838.38) | $0.00 | $10,737.30 | | $26,000.00 | $26,000.00 |
| 2012 | $3,055.46 | ($199.95) | $10,904.16 | $5,898.85 | $0.00 | $19,658.52 | $4,306.27 | $24,000.00 | $28,306.27 |
| 2013 | $2,842.14 | ($1,163.00) | $12,148.48 | ($2,296.83) | $8,378.68 | $19,909.47 | $4,773.82 | $16,000.00 | $20,773.82 |
| 2014 | $3,065.33 | $0.00 | $15,055.07 | ($1,205.70) | $0.00 | $16,914.70 | $4,506.80 | $18,400.00 | $22,906.80 |
| 2015 | $2,930.76 | ($5,752.54) | $14,181.85 | ($3,721.15) | $0.00 | $7,638.92 | $21,207.45 | $10,141.98 | $31,349.43 |
| TOT | $63,164.40 | ($38,109.30) | $188,380.23 | ($39,664.38) | ($44,686.71) | $129,084.24 | $109,251.00 | $324,496.13 | $433,747.13 |

56.    The Accounting IRWIN filed by Dosik on 10/30/19 (Exhibits 13 & 16) reflect that Dosik had received  $676,392.30 in principal and that it had dwindled to $398,847.56 by the end of 2015:

| | IRA | Other | Cum Total | Net Income | Distributions | IRA Y/E Val | Taxable Y/E Val | Total Y/E Val |
|---|---|---|---|---|---|---|---|---|
| 2002 | $63,709.69 | $178,050.00 | $241,759.69 | $7,947.08 | $9,550.00 | $65,567.97 | $174,707.78 | $240,275.75 |
| 2003 | $27,283.78 | $45,442.66 | $314,486.13 | $14,076.34 | $5,000.00 | $103,637.96 | $234,507.52 | $338,145.48 |
| 2004 | | $6,087.00 | $320,573.13 | $17,183.01 | $19,727.66 | $109,112.06 | $239,193.90 | $348,305.96 |
| 2005 | | $290.29 | $320,863.42 | $16,574.76 | $20,578.66 | $108,490.49 | $228,262.79 | $336,753.28 |
| 2006 | | $355,235.02 | $676,098.44 | $19,688.10 | $46,951.83 | $118,283.09 | $574,797.84 | $693,080.93 |
| 2007 | | | $676,098.44 | $31,116.76 | $56,230.00 | $89,227.19 | $531,712.13 | $620,939.32 |
| 2008 | | | $676,098.44 | ($118.26) | $86,929.66 | $63,120.66 | $343,920.84 | $407,041.50 |
| 2009 | | $293.86 | $676,392.30 | ($71,243.16) | $40,943.00 | $59,325.11 | $329,324.14 | $388,649.25 |
| 2010 | | | $676,392.30 | $19,000.70 | $18,500.00 | $64,469.41 | $348,713.85 | $413,183.26 |
| 2011 | | | $676,392.30 | $10,737.30 | $26,000.00 | $60,721.01 | $328,264.74 | $388,985.75 |
| 2012 | | | $676,392.30 | $19,658.52 | $28,306.27 | $62,228.77 | $330,891.69 | $393,120.46 |
| 2013 | | | $676,392.30 | $19,909.47 | $20,773.82 | $59,518.93 | $354,696.54 | $414,215.47 |
| 2014 | | | $676,392.30 | $16,914.70 | $22,906.80 | $63,079.50 | $363,327.28 | $426,406.78 |
| 2015 | | | $676,392.30 | $7,638.92 | $31,349.43 | $60,113.86 | $338,733.70 | $398,847.56 |

57.    In June 2016, Michael Needle put Unit16A7 up for sale in his capacity as Rhea Needle's Agent under a General and Durable Power of Attorney.  Thereafter, Dosik and Susan Dosik represented to Claimants that Rhea Needle she had been "living on her dividends" and principal had been conserved, in phone calls in February 2017, May 2017, July 2017, August 2017, September 2017 and October 2017.

58.     On December 8, 2017, Michael Needle, as Rhea Needle's Agent, sold Unit 16A7,2401 Pennsylvania Avenue.

59.     Dosik  represented that Rhea Needle had been "living on dividends" and enjoying large gains in 2016-17 bull market.  In reliance on these representations, Michael Needle, as Rhea Needle's Agent agreed to invest the$481,415.87 in net proceeds in the Taxable Account. These were false.  Claimants did not learn any of this until receiving and reviewing Dosik's Accounting of the IRA and Taxable Account filed on 10/30/19.

60.     TRP and Dosik concealed the high risks, low yields, and large principal diminution due to Dosik's imprudent investment strategy" from August 2008 through December 8 2017 from Rhea Needle by not sending account statements to her (and Michael Needle, her Agent under General and Durable Power of Attorney). Claimants did not learn any of this until receiving and reviewing Dosik's Accounting of the IRA and Taxable Account filed on 10/30/19. Exhibits 13, 16.

61.     Claimants are informed and believe that, at all times relevant hereto, TRP failed to request or obtain a "Trusted Contact" for Rhea Needle as required by an amendment to FINRA Rule 4512 to add subparagraph (a)(1)(F), requiring TRP to make and keep a record of the "name of and contact information for a trusted contact person age 18 or older who may be contacted about the customer's account."

**Death of Rhea Needle / Assignment of IRA / Discovery of Fraud**

62.    On September 18, 2018, Rhea Needle died.  All right, title and interest in the IRA, including any securities in it, was assigned to Claimants and Susan Dosik pursuant to the Uniform Transfer on Death Security Registration Act adopted by Maryland and Pennsylvania. MD Trusts & Estates Code, §§ 16-101-16-112; 20 Pa.C.S. §§ 6401-6413.  Under the Uniform Transfer on Death Security Registration Act, the Estate of Rhea Needle did not receive any right, title or interest in the IRA.

63.    20 Pa.C.S. §5601.3 required Dosik to keep and to "disclose receipts, disbursements or transactions conducted on behalf of the principal" to a "successor in interest of the principal's estate."  After Rhea Needle's death, Claimants asked Dosik how much was in the TRP accounts and for statements.  In violation of the aforementioned statutes, Dosik ignored Claimants for over two months. [He also probated a Will dated November 20. 1998 which Claimants believe was revoked by a subsequent Will kept in safe deposit box emptied by Dosik].

64.    On December 6, 2018, Claimants wrote Dosik demanding a copy of the most recent TRP statement.  Exhibit 7.

65.    On December 13, 2018, Dosik promised Claimants (by email) to supply TRP statements but stated that he needed to get copies from TRP to do so.  This was false: he had received and retained monthly account statements from January 2002 through September 2018.

66.    That same day and thereafter, Dosik insisted on meeting in a lawyer's office to divide up Rhea Needle's Estate before Claimants received or reviewed the promised TRP account statements.  Claimants declined to do so.

67.    On or about December 24, 2018, Claimants received year end TRP summaries (2002-17) and an October 2018 statement from Dosik. See: Exhibit 25, particularly Attachment 2 (pp. 4-37).  These did not reveal amounts and dates of contributions by Rhea Needle to the TRP Accounts, distributions of principal or most of Dosik's trades.

68.    Dosik did not supply account opening documents, customer agreements, and amendments thereto and has since refused to do so in violation of 20 Pa.C.S. §5601.3.

69.    In February 2019, Claimants sent signed IRA Distribution Forms to TRP per instructions by TRP.  See Exhibit 8.  On or about March 7, 2019, TRP created customer accounts for Claimants entitled

• T. Rowe Price Trust Co. Cust. For the IRA of Rhea S Needle (DCD) William A. Needle (Bene)

• T. Rowe Price Trust Co. Cust. For the IRA of Rhea S Needle (DCD) Michael R. Needle (Bene)

70.    In March 2019, each of  these accounts received one-third of the securities in the IRA and these securities were sold, with Claimants each receiving about $15,735.

71.    On March 14, 2019,  Claimant William A. Needle petitioned the Orphans Court of Philadelphia County to compel Dosik to account as Agent and produce records of "receipts, disbursements or transactions * * *on behalf of the principal" as required by 20 Pa.C.S. §5601.3(d).  Exhibit 9.

72.    On or about May 3, 2019, Dosik filed an answer (Exhibit 10) opposing the petition on the grounds, inter alia:

- "Dosik represented to [Rhea Needle] that he was qualified and competent to manage her savings by virtue of his accounting background and experience in such matters, as well as his probity as a certified public accountant." *Id*., p. 3.

- "Dosik "opened accounts on behalf of the Decedent with T. Rowe Price" *Id*

- Dosik "managed [Rhea Needle's] investments with diligence, prudence and care." *Id.,* pp. 4, 7, 8.

- Mr. Dosik has "not used any of the funds in the Decedent's T. Rowe Price accounts for personal gain." *Id.,* p. 9

- Petitioner has "failed to make even a prima facie showing that an account should be compelled" due to the availability of statements (which Dosik was still withholding) *Id*., p. 10.

73.    On June 27, 2019, the Orphans Court rejected these arguments and ordered Dosik to "file an Account of his administration of Principal's estate from 12/26/2001 to 09/18/2018 * * * or before October 30, 2019." Exhibit 11.

74.    Dosik then produced TRP monthly statements sent to him at his house. These did not disclose principal contributions and distributions. Dosik withheld account opening forms, customer agreements, and the like  in violation of 20 Pa.C.S. §5601.3(d) and continues to do so.

75.    On October 30, 2019, Claimants received three accountings: IRA (Exhibit 13), Taxable Account (Exhibit 16) and a checking account (Exhibit 19). These revealed the amounts (and dates) of principal contributions and distributions to Claimants for the first time:

|  | **IRA** | **Taxable** | **Total** |
|---|---|---|---|
| Total receipts | $160,739.34 | *$1,360,479.12 | $1,521,218.46 |
| Principal Contributions | $90,983.47 | $1,066,814.70 | $1,157,798.17 |
| Interest/Dividend Income | $69,755.87 | $223,409.60 | $293,165.47 |
| Trading losses | ($45,623.53) | ($79,933.75) | #($125,557.28) |
| Income after losses | $24,132.34 | $143,475.85 | $167,608.19 |
| Yield on contributions | 1.58% | 0.80% | 0.86% |
| "General Disbursements" |  | $148,240.78 | $148,240.78 |
| Other Principal Distributions |  | $436,085.13 | $436,085.13 |
| Balance on hand, 9/18/18 | $44,276.84 | $696,220.96 | $740,497.80 |

*Includes $70,254.82 in IRA distributions; #Includes. $35,595.81 stock market loss

76.    On December 2, 2019, Claimant William A. Needle objected to these accountings.  Three of the six objections sought to surcharge Dosik.

77.    Dosik moved to dismiss the surcharge objections with prejudice on the grounds that his transactions in the TRP accounts were disclosed to and ratified by Rhea Needle.

78.    Claimants responded that there had been no such disclosure and ratification because TRP and Dosik never sent a statement to Rhea Needle (or Michael Needle, her Agent under General and Durable Power of Attorney).

79.    On February 12, 2020, the Orphans Court dismissed the surcharge objections without prejudice for "lack of standing." Exhibit 20.  (It later explained that only Dosik as Executor could seek a surcharge against Dosik as Agent. See Exhibit 22, pp. 10-11).

80.    After the COVID layoff, Claimants engaged Paul Irwin, an attorney and trust administration executive, to review Dosik's Accountings.  He concluded that Dosik lacked a coherent investment strategy and acted imprudently by overpaying for low-grade bonds, failing to diversify, and by attempting to time market swings in purchases and sales of equity funds.

81.    On October 21, 2021, Paul Irwin issued a report that Dosik's "management was unprofessional and caused financial loss to Mrs. Needle." Exhibit 21.  A supplemental report quantified that loss as $331,726.38, showing that the TRP Accounts would have had $1,072,224.18 in September 2018 had the $1,157,798.17 in principal been prudently invested by Dosik. Exhibit 27.  $76,247.55 of this loss was in the IRA.  Per Irwin's analysis, the IRA would have had $120,524.29 in September 2018 had Dosik prudently invested $90,983.47 in principal:

|  | $Transfers | $Distributions | Income (65%) | Equity (35%) |  | Proxy Growth Factors | |
|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  | Vanguard | Russell 3000 |
| Start | $61,154.81 |  | $39,750.63 | $21,404.18 |  |  |  |
| 2002 | $2,544.88 | $2,700.00 | $43,034.03 | $16,774.46 |  | 8.26% | -21.63% |
| 2003 | $27,283.78 | $3,172.90 | $42,917.81 | $20,700.18 |  | 3.97% | 30.77% |
| 2004 |  | $4,710.86 | $61,074.09 | $32,565.74 |  | 4.24% | 11.76% |
| 2005 |  | $5,146.79 | $59,404.32 | $32,762.68 |  | 2.40% | 5.97% |
| 2006 |  | $5,344.35 | $58,452.62 | $35,766.49 |  | 4.27% | 15.52% |
| 2007 |  | $6,065.76 | $58,783.32 | $35,600.94 |  | 6.92% | 5.03% |
| 2008 |  | $4,907.52 | $57,621.00 | $20,994.01 |  | 5.07% | -37.29% |
| 2009 |  | $0.00 | $58,143.31 | $24,712.31 |  | 6.82% | 28.20% |
| 2010 |  | $3,469.32 | $63,696.00 | $28,849.15 |  | 9.55% | 16.74% |
| 2011 |  | $3,955.20 | $67,965.97 | $27,872.55 |  | 10.62% | 0.86% |
| 2012 |  | $3,917.52 | $69,985.82 | $30,787.27 |  | 7.02% | 16.23% |
| 2013 |  | $4,204.68 | $65,119.52 | $39,197.00 |  | -3.44% | 33.25% |
| 2014 |  | $4,221.24 | $66,753.53 | $42,388.22 |  | 7.00% | 12.36% |
| 2015 |  | $5,022.72 | $64,797.04 | $41,053.97 |  | 1.23% | 0.35% |
| 2016 |  | $5,163.72 | $63,292.10 | $44,227.67 |  | 2.86% | 12.55% |
| 2017 |  | $4,768.80 | $62,213.24 | $51,307.44 |  | 3.80% | 20.95% |
| 2018 |  | $3,483.44 | **$71,938.80** | **$48,585.59** |  | *0.00%* | *10.51%* |
|  | $90,983.47 | $70,254.82 |  |  |  |  |  |
| Distributions subtracted on the first of the year; transfers added on the first of the following year; | | | | | | | |

**14**

82.     At all times relevant hereto, TRP and Dosik concealed the high risks, low yields, and large principal diminution of the IRA of and from Dosik's imprudent investment strategy" from Rhea Needle by not sending account statements to her (or Michael Needle, her Agent under General and Durable Power of Attorney). Claimants did not learn any of this until receiving and reviewing the Accounting of the IRA and Taxable Account filed on 10/30/19. Exhibits 13, 16.

83.     The Accounting shows $148,239.28 in "General Disbursements" for living expenses and another $436,085.13 in "Distributions of Principal to Principal."  Exhibit 16, pp. 37-44.

84.     At least $400,000 was unexplained, despite Dosik's possession of bank records enabling him to do so (Exhibit 4) and well above income needed by Rhea Needle to pay her living expenses. Such unexplained distributions sharply increased after receipt of the Ventnor Condominium proceeds (in 04-05), receipt of the 1173 Dixon Lane sale proceeds (in 06-08), and Dosik becoming a signatory on Rhea Needle's Wells Fargo checking account:

| Year | Principal Contributions | | Principal Distributions | |
|------|------------|--------------|-------------|--------------|
|      | **IRA** | **Taxable*** | **General** | **Other** |
| 2002 | $63,709.69 | $178,050.00 | | $9,550.00 |
| 2003 | $27,283.78 | $45,442.66 | | $5,000.00 |
| 2004 | | $6,087.00 | | $19,727.66 |
| 2005 | | $290.29 | $7,461.00 | $13,117.66 |
| 2006 | | $355,235.02 | $6,893.00 | $40,058.83 |
| 2007 | | | $230.00 | $56,000.00 |
| 2008 | | | $40,929.66 | $46,000.00 |
| 2009 | | $293.86 | $18,943.00 | $22,000.00 |
| 2010 | | | | $18,500.00 |
| 2011 | | | | $26,000.00 |
| 2012 | | | $4,306.27 | $24,000.00 |
| 2013 | | | $4,773.82 | $16,000.00 |
| 2014 | | | $4,506.80 | $18,400.00 |
| 2015 | | | $21,207.45 | $10,141.98 |
| 2016 | | | $17,131.65 | $46,214.00 |
| 2017 | | $481,415.87 | $21,857.13 | $55,375.00 |
| 2018 | | | | $10,000.00 |
| **TOTALS** | **$90,577.62** | **$1,066,814.70** | **$148,240.78** | **$436,085.13** |

85.     Claimants are informed and believe that much of this $436,085.13 was diverted to, misappropriated by and/or looted by Dosik and/or Susan Dosik.  They neither knew nor could have suspected this prior to the identification of all principal contributions and distributions by the accountings filed by Dosik on 10/30/19.

**Related Legal Proceedings**

.

86.     On September 21, 2021, Claimants petitioned the Orphans Court to appoint them as temporary fiduciaries (under 20 Pa. C.S. § 4301) to bring claims by the Estate against TRP (and Dosik),  alleging that "Dosik will not initiate an action against T. Rowe Price.".

87.     On October 8, 2021, Dosik answered, confirming that he would not pursue the Estate's claims against TRP.  Appellants filed a  Reply to the "New Matter" in this Answer.

88.     On October 30, 2021,  Claimants sued TRP and Dosik, individually and as executor of the Estate of Susan Dosik, in the United States District Court for the Eastern District of Pennsylvania (Civil Action No. 21-4786) to preserve their rights regarding the IRA,  which is not part of the Estate of Rhea Needle.  This suit did not cover the Taxable Account.

89.     On November 3, 2021, the Orphans Court tried Dosik's claims for a $75,919 management commission and $30,960 preparation fee. Exhibit22.  By Decree dated November 8, 2021 (Exhibit 23), it denied Dosik's claim for a  $75,919 management fee.  Claimants appealed the Orphans Court's refusal to permit a surcharge action against Dosik in the Agent Accounting. No. 2559 EDA 2021.

90.     By Order sent to the parties on November 19, 2021 but dated October 20, the Orphans Court *sua sponte* granted a demurrer to Claimants' Petition for Appointment as Temporary Fiduciaries," stating that "the relief requested * * * is not within the scope of authority of this court."  Exhibit 24.  Claimants appealed this. (No 2625 EDA 2021).

91.     On November 22, 2021, Claimants, by counsel, requested TRP to produce account opening documents and customer agreements, including amendments, executed by Dosik under the POA.  Exhibit 25.

92.     On November 24, 2021, TRP, by counsel, refused to produce such documents.

93.     On December 17, 2021, Claimants moved the district court to stay their claims against TRP to allow arbitration of those claims pursuant to FINRA Rule 12000 *et seq*. This motion also requested the district court to compel production of the account opening documents and customer agreements, including amendments, executed by Dosik under the POA.

94.     On January 28, 2022, Claimants filed an Amended Complaint (Exhibit 28) with requests for relief under 9 U.S.C. §§ 3 & 4 and, shortly thereafter, filed this case (FINRA-DR Arbitration Number 2022-0217)

95.     By order and opinion dated August 19, 2022  (Exhibit  29), following extensive motion practice, the district court dismissed the Amended Complaint against TRP, including claims to compel arbitration, on the grounds that the only the Estate of Rhea Needle had standing to pursue claims arising out of the opening and operation of Rhea Needle's two TRP brokerage accounts (including FINRA-arbitral claims).

96.     On December 13, 2023, at the trial of one of the lawsuits between them, Dosik and Claimants reached a global settlement of all litigation in or relating to the Estate of Rhea Needle.  As stated by Dosik's counsel on the record (Exhibit 30), the material terms were:

• Ed Dosik will be entitled to the $30,960 fee that the Orphans' Court deemed him to be entitled to in the power of attorney action for his accounting preparation fees. Ed Dosik will be entitled to take his commission as executor as stated in the petition for adjudication in the accounting which is in the amount of $26,800. (Ex. 30, p. 9)

• The one-third share that is to go to Susan's estate will be split 50 percent with 50 percent going -- that 50 percent that is taken out of her share will go half to William and half to Michael. *Id.*

• William and Michael, we agreed, could be appointed then as administrators DBNCTA of Rhea's estate because they wish to pursue the FINRA matters against T. Rowe Price. And they require the ability to stand in her shoes to do that. And we will step aside. *Id.*, p. 10.

• Michael Needle has sought certain account documents from T. Rowe Price and Wells Fargo. …Mr. Dosik … will look for them and we will provide them to Michael Needle in connection with the settlement. *Id.*, p. 11)

• everyone is going to bear their own attorneys' fees and costs. * * * Michael Needle and William Needle are not going to seek to have any of their costs recovered from Mr. Dosik or from the estate. And Mr. Dosik is going to forgo the claim he currently has for his attorneys' fees and is going to agree not to seek to have any of his other attorneys' fees recovered from the estate or from William Needle or Michael Needle … *Id.* p. 14

97.     Thereafter, Dosik provided Claimants with an updated accounting for the Estate which showed that he took or planned to take $60,099.82 in legal fees and another $1,661.61 in legal costs incurred by him from the Estate.  He did not supply the underlying invoices despite repeated requests over the years.

98.     On March 21, 2024, the Orphans Court conducted a telephone conference with Claimants and Dosik's counsel, ordered Dosik and his counsel to produce all invoices for legal fees and costs charged by Dosik the Estate, and set an in-person settlement conference for May 22, 2024.

99.     On May 22, 2024, Claimants and Dosik's counsel appeared in the Orphans Court. The Court recommended that the $61,761.43 in legal fees and costs taken from the Estate by Dosik be reduced to $20,000.  Claimants and Dosik's counsel agreed to this proposal.  The Orphans Court instructed Dosik's counsel to file an Amended Accounting to be audited in open court on August 5, 2022.

100.    On June 12, 2024, Dosik filed an Amended First and Final Account and Schedule of Distribution.  It did not reduce fees and costs taken by Dosik from the Estate from $61,761.43 to $20,000 as agreed on May 22, 2024.

101.    On August 2, 2024, Claimants filed objections to the Amended Accounting (Exhibit 31) on the grounds, *inter alia*, that it did not conform to the compromise made on May 22, 2024.

102.    On September 3, 2024, Claimants, Dosik, and Dosik's counsel appeared at an audit in the Orphans Court at which time Claimants' Objections to the Amended Accounting were heard.

103.    On September 12, 2024, the Orphans' Court issued an "Adjudicatory Decree" (Exhibit 32) providing, *inter alia*, that

● "the Amended First and Final Account and Schedule of Distribution is APPROVED * * * with the following clarifications: 1) The parties shall bear their own legal fees and costs …

● the Court * * * carved out authority for the Needle brothers right to proceed with litigation against T. Rowe Price with the Estate of Rhea Needle as plaintiff.  All attorney's fees and costs for this litigation--- and any award by, settlement or trial will go to the Estate for distribution to the Needle brothers only.

● These issues were formally resolved resulted in a Settlement Agreement with the involvement of the instant court on May 22, 2024.

## FIRST CLAIM
## PURSUANT TO 15 U.S.C. § 78j & 17 C.F.R. §240.10b-5

104.    Paragraphs 1 through 103 above are restated as if set forth in full herein.

105.    In violation of Section 10 of the Securities Exchange Act, 15 U.S.C. §78j, and Rule 10b-5(a) thereunder, TRP used the facilities of national securities exchanges to perpetrate an "artifice or scheme to defraud in connection with the purchase and sale of the securities" in the IRA, including Claimants' sale of such securities in March 2019.

106.    In violation of Section 10 of the Securities Exchange Act, 15 U.S.C. §78j, and Rule 10b-5(c) thereunder, TRP used the facilities of national securities exchanges to engage in practices and a course of business which operated as a fraud or deceit in in connection with the purchase and sale of the securities in the IRA, including Claimants' sale of such securities in March 2019.

107.    Solely and proximately as a result of this conduct, Rhea Needle and the Estate of Rhea Needle suffered an ascertainable loss of money or property in an amount to be determined by the trier of fact which Claimants presently estimate as $331,726.38 as set forth in the following table.  In the alternative, Claimants as sellers and/or as Rhea Needle's registered beneficiaries, assignees, and successors in interest suffered an ascertainable loss of money or property in an amount to be determined by the trier of fact which Claimants presently estimate as $50,831.70 as set forth in the following table.

| | |
|---|---|
| $951,699.79 | DOD Value of Taxable Account if Prudently Invested Per Irwin  (Exhibit 27) |
| $696,220.96 | DOD Value of Taxable Account Per Dosik Accounting (Exhibit 16) |
| $255,478.83 | Lost Taxable Account Principal by Rhea Needle and Estate of Rhea Needle |
| | |
| $120,524.39 | DOD Value of IRA if Prudently Invested Per Irwin  (Exhibit 27) |
| $44,276.84 | DOD Value of IRA Per Dosik Accounting (Exhibit 13) |
| $76,247.55 | Lost IRA Principal by Rhea Needle and Estate of Rhea Needle |
| | |
| **$331,726.38** | Total Lost Principal by Rhea Needle and Estate of Rhea (Claimants as co-Administrators) |
| | |
| $50,831.70 | IRA Beneficiary Lost Principal (Claimants as IRA Beneficiaries @ $25,415.83) |

## SECOND CLAIM
## PURSUANT TO 73 P.S. §201-9.2

108.    Paragraphs 1 through 107 above are restated as if set forth in full herein.

109.    TRP's conduct as set forth above, including but not limited to its failure to send Rhea Needle, directly or via Michael Needle as her Agent under General & Durable Power of Attorney, with copies of customer agreements, related communications and account statements, constituted "fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding" within the meaning of Section 2(4)(xx) of the Pennsylvania Unfair Trade Practices Act, 73 P.S. §201-2(4)(xx), and violated Section 3 of that Act, 73 P.S. §201-3.

110.    Solely and proximately as a result of this conduct, Rhea Needle and the Estate of Rhea Needle suffered an ascertainable loss of money or property in an amount to be determined by the trier of fact which Claimants presently estimate as $331,726.38 as set forth above.

111.    Claimants are entitled to recover these actual damages and request treble damages damages, costs and a reasonable attorney fee pursuant to Section 9.2 of the Pennsylvania Unfair Trade Practices Act, 73 P.S. §201-9.2.

## THIRD CLAIM
## FRAUD AND DECEIT

112.    Paragraphs 1 through 111 above are restated as if set forth in full herein.

113.    TRP's conduct as set forth above, including but not limited to its failure to send Rhea Needle, directly or via Michael Needle as her Agent under General & Durable Power of Attorney, with copies of customer agreements, related communications and account statements, constituted a fraud on Rhea Needle under common law.

114.  Solely and proximately as a result of this conduct, Rhea Needle and the Estate of Rhea Needle suffered an ascertainable loss of money or property in an amount to be determined by the trier of fact which Claimants presently estimate as $331,726.38 as set forth above.

115.    Said conduct was malicious and warrants the imposition of punitive damages.

## FOURTH CLAIM
## **NEGLIGENCE**

116.    Paragraphs 1 through 115 above are restated as if set forth in full herein.

117.    TRP's conduct as set forth above, including but not limited to its failure to send Rhea Needle, directly or via Michael Needle as her Agent under General & Durable Power of Attorney, with copies of customer agreements, related communications and account statements, constituted a breach of its duty to care to Rhea Needle under common law.

118.  Solely and proximately as a result of this conduct, Rhea Needle and the Estate of Rhea Needle suffered an ascertainable loss of money or property in an amount to be determined by the trier of fact which Claimants presently estimate as $331,726.38 as set forth above.

119.    Said conduct was malicious and warrants the imposition of punitive damages.

## FIFTH CLAIM
## **BREACH OF CONTRACT**

120.    Paragraphs 1 through 119 above are restated as if set forth in full herein.

121.    TRP's conduct as set forth above, including but not limited to its failure to send Rhea Needle, directly or via Michael Needle as her Agent under General & Durable Power of Attorney, with copies of customer agreements, related communications and account statements, was in breach of its express and implied obligations to Rhea Needle under its brokerage agreements with Rhea Needle for "IRA FBO Rhea S Needle Trp Trust co Custodian Rollover Account Edward Dosik Trp/Poa" and "Edward B Dosik, Agent TRP/POA Dtd12/26/2001 Rhea S Needle,"

122.  Solely and proximately as a result of this conduct, Rhea Needle and the Estate of Rhea Needle suffered an ascertainable loss of money or property in an amount to be determined by the trier of fact which Claimants presently estimate as $331,726.38 as set forth above.


William A. Needle
1904 Wallace Street
Philadelphia PA 19130
215-593-7415
bneedle1@gmail.com

Michael R. Needle
1904 Wallace Street
Philadelphia PA 19130
215-764-9705
mnjam@gmail.com

## EXHIBIT INDEX

| | |
|---|---|
| 1 | General & Durable Power of Attorney, 10/23/98 |
| 2A | IRA Brokerage – New Account Form, 12/15/01 |
| 2B | T. Rowe Price Power of Attorney, 12/26/01 |
| 3 | IRA Distribution Request, 2/21/02 |
| 4 | Email re removing records, 1/17/16 |
| 5 | Email re living off dividends, 2/10/16 |
| 6 | Email re living off dividends 3/6/16 |
| 7 | Letter to Dosik, 12/6/18 |
| 8 | Letter to TRP, 2/22/19 |
| 9 | Petition for Accounting, 3/14/19 |
| 10 | Answer to Petition for Accounting, 5/3/19 |
| 11 | Order to Account, 6/27/19 |
| 12 | Agent Petition for Adjudication (wo exhibits), 10/30/19 |
| 13 | IRA Accounting |
| 14 | Table One – IRA securities transactions |
| 15 | Table Two -- IRA contributions, gains, distributions |
| 16 | Taxable Account Accounting, 10/30/19 |
| 17 | Table Three – Taxable Account securities transactions |
| 18 | Table Four -- Taxable Account contributions, gains, distributions |
| 19 | Wells Fargo Accounting |
| 20 | Order dismissing surcharge objections wo prejudice |
| 21 | Paul Irwin Report, 10/21/21 |
| 22 | Trial Transcript, 11/3/21 |
| 23 | Order on Objections to Agent Accounting, 11/8/21 |
| 24 | Order issued 11/19/21 |
| 25 | Letter, Hollister to Duffy,  11/22/21 |
| 26 | Letter, Duffy to Hollister, 11/24/21 |
| 27 | Irwin Supplemental Report, 12/27/21 |
| 28 | Amended Complaint, 1/28/22 |
| 29 | District Court Order and opinion dated August 19, 2022 |
| 30 | Settlement Agreement dated December 13, 2023 |
| 31 | Objections to Amended First and Final Account and Schedule of Distribution, August 2, 2024 |
| 32 | Adjudicatory Decree, September 12, 2024 |

# EXHIBIT E

```
        IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
            FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
                    CIVIL TRIAL DIVISION


WILLIAM A. NEEDLE and            )
MICHAEL R. NEEDLE                )
                                 )
         Plaintiffs,             ) May Term 2021
                                 ) No. 02650
   v.                            )
                                 )
EDWARD DOSIK, Individually       )
and as Executor of the           )
Estate of Susan N. Dosik         )
                                 )
         Defendants.             )
```

- - - -

SETTLEMENT ON THE RECORD

- - - -

DECEMBER 13, 2023
COURTROOM 285
CITY HALL
PHILADELPHIA, PENNSYLVANIA

- - - -

BEFORE:  THE HONORABLE GLYNNIS HILL, J.

Reported by:

Anne L. Swoyer, RPR, CCR
Official Court Reporter
Anne.Swoyer@courts.phila.gov

**EXHIBIT 30**

| | |
|---|---|
| 1  involves T. Rowe Price.  Mr. Dosik is not | 1  the estate accounting matter, and is an appellant |
| 2  involved in that action.  But I will agree that | 2  in the two Pennsylvania Superior Court appeals |
| 3  that is out there. | 3  relating to the power of attorney action, and |
| 4          So with that, the terms that we have | 4  also plaintiff and appellant in the Federal Court |
| 5  agreed upon in order to resolve all of the | 5  actions, and is also involved in the FINRA action |
| 6  outstanding matters as between really what are | 6  is another party.  William Needle, who carries |
| 7  all of the -- they are definitely the parties to | 7  all the same qualifications as Michael Needle |
| 8  this action, which following the court's orders | 8  does, states that he is not a plaintiff any |
| 9  on preliminary objections, the only parties in | 9  longer in this matter. |
| 10  this action right now are Mr. Dosik and Michael | 10          William Needle and Michael Needle and |
| 11  Needle.  But because of the parties' relationship | 11  Susan Dosik were Rhea Needle's three children. |
| 12  in connection with all of the other matters, a | 12  Mr. Dosik was married to Susan Dosik before she |
| 13  global settlement is required. | 13  passed. |
| 14          And if I may, I just want to take a | 14          So the terms of the settlement that |
| 15  minute to note all of the parties and their | 15  have been reached by the parties are this action |
| 16  relationships.  So the parties that will be | 16  will be dismissed with prejudice.  The pending |
| 17  involved in this settlement are the Estate of | 17  appeals in the Superior Court will both be |
| 18  Rhea S. Needle, Edward Dosik.  And he will be | 18  dismissed or withdrawn by William Needle and |
| 19  involved individually as agent under power of | 19  Michael Needle. |
| 20  attorney for Rhea Needle, as executor of the | 20          In the estate accounting matter, which |
| 21  estate of Rhea Needle, and as executor of the | 21  is currently pending before Judge Overton in the |
| 22  estate of his late wife, Susan Dosik. | 22  Orphans' Court, we will figure out the exact |
| 23          Michael Needle, who is plaintiff in | 23  process to resolve that matter.  But the |
| 24  this matter, was a petitioner, an objectant in | 24  objections that have been filed will be |
| 25  the power of attorney action, is an objectant in | 25  withdrawn.  There will be a settlement agreement |

| | |
|---|---|
| 1  in which we have agreed that we will present a | 1  is about $600,000 in the estate.  And so the |
| 2  distribution schedule for the assets of the | 2  accounting fee and the executor commission will |
| 3  estate in the following way. | 3  come off the top.  And then the remainder will be |
| 4          Ed Dosik will be entitled to the | 4  distributed as I just stated. |
| 5  $30,960 fee that the Orphans' Court deemed him to | 5          THE COURT:  Thank you. |
| 6  be entitled to in the power of attorney action | 6          MS. SCHULTZ:  And once that happens, |
| 7  for his accounting preparation fees.  Ed Dosik | 7  concomitant with that, Mr. Dosik gets discharged |
| 8  will be entitled to take his commission as | 8  for all of his actions taken as executor, |
| 9  executor as stated in the petition for | 9  releases go every which way for every matter or |
| 10  adjudication in the accounting which is in the | 10  thing that could have been brought in the estate |
| 11  amount of $26,800.  And then the remaining | 11  action or as a result of Mr. Dosik having been |
| 12  principal and income in the estate account will | 12  Mrs. Needles' agent during her lifetime. |
| 13  be distributed. | 13          And William and Michael, we agreed, |
| 14          It was to be distributed one-third to | 14  could be appointed then as administrators DBNCTA |
| 15  each of Rhea's children, Susan, Michael and | 15  of Rhea's estate because they wish to pursue the |
| 16  William.  It will be distributed one-third to | 16  FINRA matters against T. Rowe Price.  And they |
| 17  Michael, one-third to William, and then the | 17  require the ability to stand in her shoes to do |
| 18  one-third share that is to go to Susan's estate | 18  that.  And we will step aside.  Mr. Dosik will |
| 19  will be split 50 percent with 50 percent going -- | 19  step aside.  And he will have nothing more to do |
| 20  that 50 percent that is taken out of her share | 20  with the estate at that point. |
| 21  will go half to William and half to Michael. | 21          Any cost and expenses of those actions |
| 22          With that -- | 22  will be borne by William Needle and Michael |
| 23          THE COURT:  What are the numbers? | 23  Needle.  Mr. Dosik will not be entitled to any of |
| 24          MS. SCHULTZ:  I don't have the exact | 24  the proceeds should they be successful.  They |
| 25  numbers, Your Honor.  But rough estimate, there | 25  will reap those rewards.  Mr. Dosik will be held |

**EXHIBIT 30**

# EXHIBIT F

IN THE COURT OF COMMON PLEAS
PHILADELPHIA. PENNSYLVANIA
ORPHANS' COURT DIVISION
O.C. No. 322 DE of 2019

Control Nos. 214932, 213415, 230960

ESTATE OF RHEA S. NEEDLE, Deceased

Rhea S. Needle, Deceased [KLG]



20190032205062

The Amended Account/Statement of Proposed Distribution of the First and Final Account of Edward Dosik, Executor/Accountant of the Estate of Rhea S. Needle was called for Audit on Tuesday, September 3, 2024 in-person in Courtroom 414, City Hall, Philadelphia, PA.

Before: Judge Ramy I. Djerassi

Counsel appeared as follows:

Michael Needle, Esquire, *pro se* for Objectors, Michael Needle and William Needle.
Courtney L. Schultz, Esquire - Counsel for Executor/Accountant, Edward Dosik.

## ADJUDICATORY DECREE

**AND NOW**, this 12th day of September, 2024, following an in-person Audit on September 3, 2024, and upon finding good faith progress in the execution of a Settlement Agreement reached between Accountant/Executor Edward Dosik and Objectors Michael Needle and William Needle and incorporating by reference a factual history stated in Judge Overton's Decree entered on October 14, 2023, it is now **ORDERED and DECREED** that the Amended First and Final Account and Schedule of Distribution of the Estate of Rhea S. Needle, Deceased is APPROVED as entered on June 12, 2024 by Executor/Accountant Edward Dosik through counsel Courtney L. Schultz, Esquire with the following clarifications:

1) The parties shall bear their own legal fees and costs.

2) The remaining balance for distribution from Estate accounts at Bank of America and T. Rowe Price is calculated based on monetary value on September 4, 2024 in a range between $676,00 and $685, 000.

1

**EXHIBIT 32**

On December 2, 2019, William Needle, filed Objections to the First and Final Account of Edward Dosik. Former Agent Under Power of Attorney for Principal, Rhea S. Needle, Deceased.

Thereafter, due to the closure of City Hall during the COVID-19 pandemic, this case was held in abeyance.

On November 3, 2021, the Court held a one-day in-person trial on the Objections to the Account.

Following the trial, the Court issued a Decree dated November 8, 2021 and thereafter Objectors filed a Notice of Appeal. The result was a quash of all objections except the fourth one which complained of the court's absolute affirmance of the Executor/Accountant's First and Final account as submitted

The Orphans' Court then issued an Amended Decree addressing the open Fourth Issue. The Court ruled that the only remaining unpaid claim against the Principal's Estate is the Accountant's request for compensation for his duties as Agent Under Power of Attorney. The Court also addressed the following matters relating to compensation to the Accountant: attorneys' fees and costs. In addition, the Court clarified the percentage distributions allocated to the Needle brothers and carved out authority for the Needle brothers right to proceed with litigation against T. Rowe Price with the Estate of Rhea S. Needle as plaintiff. All attorney's fees and costs for this litigation--- and any award by settlement or trial will go to the Estate for distribution to the Needle brothers only.

**CONCLUSION**

These issues were formally resolved resulted in a Settlement Agreement with the involvement of the instant court on May 22, 2024. On June 12, 2024, Petitioner entered an Amended First and Final Account and Schedule of Distribution and it is this filing which this Court approves here.

3

A Motion for Reconsideration of this Adjudication may be filed, or an Appeal from this Adjudication may be taken to the appropriate Appellate Court within thirty (30) days from the issuance of the Adjudication. Sec Pa. O.C. Rule 8.2 as amended, and Pa. R.A.P. 902 and 903.

**BY THE COURT**

**RAMY I. DJERASSI, J.**

Courtney L. Schultz, Esquire
Michael Needle., Esquire, pro se
William Needle
Edward Dosik

4